**No. 26-1552**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

QCX LLC d/b/a Polymarket US,
*Plaintiff-Appellant*,

*v.*

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in his official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the Michigan Gaming Control Board,

*Defendants-Appellees*.

---

On Appeal From The United States District Court
For The Western District Of Michigan
No. 1:26-cv-00710

---

**APPELLANT'S OPENING BRIEF**

---

Orin Snyder
Matt Benjamin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, DC 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

Patrick G. Seyferth
Derek J. Linkous
BUSH SEYFERTH PLLC
100 West Big Beaver, Suite 400
Troy, MI 48084
Telephone: 248.822.7800
seyferth@bsplaw.com
linkous@bsplaw.com

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1 and Rule 26.1 of this Court, Plaintiff-Appellant QCX LLC d/b/a Polymarket US states that Blockratize Inc. is the sole owner of Plaintiff-Appellant and that Blockratize Inc. has a financial interest in the outcome. Plaintiff-Appellant further states that Intercontinental Exchange, Inc. is a publicly traded company owning 10% or more of Blockratize Inc.

# TABLE OF CONTENTS

**Page**


STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................... xiv

STATEMENT OF JURISDICTION .......................... xiv

STATEMENT OF THE ISSUES .......................... xv

INTRODUCTION .......................... 1

STATEMENT OF THE CASE .......................... 5

A. Congress Grants The CFTC Exclusive Jurisdiction Over Exchange-Traded Derivatives. .......................... 5

B. Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts. .......................... 9

C. The CEA Establishes A Comprehensive Regulatory Framework For Event Contracts. .......................... 15

D. Polymarket US Operates A Designated Contract Market Subject To The CFTC's Exclusive Jurisdiction. .......................... 16

E. Polymarket US Seeks Injunctive Relief After The State Sues Another CFTC-Regulated Contract Market. .......................... 18

SUMMARY OF ARGUMENT .......................... 19

STANDARD OF REVIEW .......................... 22

ARGUMENT .......................... 22

I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions. .......................... 23

A. The CEA Expressly Preempts State Regulation Of Event Contracts Traded On CFTC-Designated Contract Markets. .......... 24

1. Congress Expressly Preempted State Law When It Gave The CFTC "Exclusive Jurisdiction." .......... 24

2. The CFTC's Exclusive Jurisdiction Extends To The Determination As To Whether A Certified Contract Is A Swap. .......... 33

3. In Any Event, Polymarket US's Event Contracts Are Swaps. .......... 38

B. Field Preemption Bars Michigan From Regulating Transactions On A CFTC-Designated Contract Market. .......... 52

C. Conflict Preemption Also Bars Michigan's Attempts To Regulate Designated Contract Markets. .......... 58

1. Michigan's Laws Pose An Obstacle To The Accomplishment Of Congress's Objectives. .......... 59

2. Michigan's Gaming Laws Are Also Subject To Impossibility Preemption. .......... 66

II. The Irreparable Harm And Public Interest Factors Strongly Support A Preliminary Injunction. .......... 68

A. Polymarket US Will Suffer Irreparable Harm Absent An Injunction. .......... 68

B. The Public Interest And Balance Of The Equities Strongly Favor An Injunction. .......... 69

CONCLUSION .......... 70

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .......... 48

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*,
977 F.2d 1147 (7th Cir. 1992) .......... 62

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011) .......... 35, 36, 37

*Arizona v. Tohono O'odham Nation*,
818 F.3d 549 (9th Cir. 2016) .......... 45

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 54, 55

*Baltimore v. QCX LLC*,
No. C-24-CV-26-005535 (Md. Cir. Ct. Aug. 13, 2026) .......... 37

*Bibbo v. Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) .......... 5, 59, 60, 61, 64

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) .......... 22

*CFTC v. Schor*,
478 U.S. 833 (1986) .......... 4, 16

*Chevron USA Inc. v. Plaquemines Par. La.*,
146 S. Ct. 1052 (2026) .......... 41, 44

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981) .......... 25, 35

*Chi. Mercantile Exch. v. Deaktor*,
414 U.S. 113 (1973) .......... 34

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .............................. 23, 24, 49, 53, 56, 58, 61, 62, 68, 69

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973) ........................................................................ 23

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
241 F.3d 123 (2d Cir. 2001) ............................................................ 41

*Counts v. Gen. Motors, LLC*,
139 F.4th 576 (6th Cir. 2025) ................................................... 58, 59

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................... 23, 24, 55

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980) ............................................ 4, 34, 49, 53

*Dayton Power & Light Co. v. FERC*,
126 F.4th 1107 (6th Cir. 2025) ......................................................... 25

*Demary v. Burtenshaw's Estate*,
131 Mich. 326 (1902) .......................................................................... 6

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ............................................................................. 30

*Dep't of Hous. & Urban Dev. v. Rucker*,
535 U.S. 125 (2002) ...................................................................... 39, 51

*Egelhoff v. Egelhoff ex rel. Breiner*,
532 U.S. 141 (2001) ............................................................................ 50

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) .............................................................................. 52

*F.T.C. v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ........................................................... 62

*Fednav, Ltd. v. Chester*,
547 F.3d 607 (6th Cir. 2008) ........ 56

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ........ 52, 56

*Fischer v. United States*,
603 U.S. 480 (2024) ........ 48

*Fitzgerald v. Racing Ass'n of Central Iowa*,
539 U.S. 103 (2003) ........ 64

*FMC Corp. v. Holliday*,
498 U.S. 52 (1990) ........ 24

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Practices Litig.*,
65 F.4th 851 (6th Cir. 2023) ........ 64

*Garcia v. United States*,
469 U.S. 70 (1984) ........ 44

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ........ 56

*Great Plains Coop. v. CFTC*,
205 F.3d 353 (8th Cir. 2000) ........ 57

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ........ 25

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ........ 62

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ........ 56

*Jones v. B.C. Christopher & Co.*,
466 F. Supp. 213 (D. Kan. 1979) ........ 31

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026) .......... 39

*KalshiEX, LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024) .......... 45

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 4, 28, 38, 41, 49, 67

*KalshiEX, LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) .......... 27

*Kelly v. Carr*,
691 F.2d 800 (6th Cir. 1980) .......... 1, 5, 8, 27, 30, 55, 62, 64

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) .......... 70

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013) .......... 30

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012) .......... 52

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 8

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 37, 42

*Magwood v. Patterson*,
561 U.S. 320 (2010) .......... 51

*Martin Marietta Corp. v. Bendix Corp.*,
690 F.2d 558 (6th Cir. 1982) .......... 69

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) .......... 46

*Matthews v. Centrus Energy Corp.*,
15 F.4th 714 (6th Cir. 2021) .......... 52

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........ 7, 11, 31, 32

*Mich. Educ. Ass'n Family Retired Staff Ass'n v. Mich. Educ. Ass'n*,
856 F. App'x 580 (6th Cir. 2021) ........ 69

*Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*,
307 F.3d 1220 (9th Cir. 2002) ........ 52

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) ........ 25

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........ 68

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) ........ 33

*Murphy v. NCAA*,
584 U.S. 453 (2018) ........ 24, 28

*Mut. Pharm. Co., Inc. v. Bartlett*,
570 U.S. 472 (2013) ........ 67, 68

*N. Nat. Gas Co. v. State Corp. Comm'n*,
372 U.S. 84 (1963) ........ 25, 55

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981) ........ 8

*Polselli v. U.S. Dep't of Treasury*,
23 F.4th 616 (6th Cir. 2022) ........ 46, 47

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025) ........ 39, 42, 42, 43

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ........ 24, 49

*Pulsifer v. United States*,
601 U.S. 124 (2024) .......... 30

*R.E. Dailey & Co. v. John Madden Co.*,
983 F.2d 1068 (6th Cir. 1992) .......... 28

*R.R. Ventures, Inc. v. Surface Transp. Bd.*,
299 F.3d 523 (6th Cir. 2002) .......... 25

*Ricci v. Chi. Mercantile Exch.*,
409 U.S. 289 (1973) .......... 34

*Rice v. Bd. of Trade of City of Chi.*,
331 U.S. 247 (1947) .......... 6, 26

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 3, 19, 26, 27, 50, 57, 58

*Rimini Street, Inc. v. Oracle USA, Inc.*,
586 U.S. 334 (2019) .......... 46

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988) .......... 58

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
473 U.S. 479 (1985) .......... 51

*Snyder v. United States*,
603 U.S. 1 (2024) .......... 46

*State of Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) .......... 22, 23

*Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003) .......... 12, 13, 46

*United States v. Damrah*,
412 F.3d 618 (6th Cir. 2005) .......... 45

*United States v. Locke*,
529 U.S. 89 (2000) .......... 49

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ........ 14, 39

*United States v. Seckinger*,
397 U.S. 203 (1970) ........ 57

*Wallis v. Pan Am. Petroleum Corp.*,
384 U.S. 63 (1966) ........ 58

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. VI, cl. 2 ........ 23

**STATUTES**

7 U.S.C. § 1a ........ 4, 9, 13, 15, 31, 39, 41, 43, 46, 48, 51, 57

7 U.S.C. § 2(a)(1)(A) ........ 1, 3, 14, 19, 20, 25, 28, 29, 31, 33, 34, 37, 38, 54

7 U.S.C. § 5 ........ 16, 55, 62

7 U.S.C. § 7 ........ 15, 16, 53

7 U.S.C. § 7a-2 ........ 15, 16, 35, 50, 53, 54, 61, 63, 65

7 U.S.C. § 7b ........ 16, 53

7 U.S.C. § 8 ........ 15, 16, 53

7 U.S.C. § 13a-2 ........ 8, 29, 32, 34, 54, 55, 56, 63

7 U.S.C. § 16 ........ 9, 13, 29, 30, 55

15 U.S.C. § 8302 ........ 16, 34, 54

15 U.S.C. § 8321 ........ 16, 34, 39, 54

Mich. Comp. Laws § 432.411 ........ 66

Mich. Comp. Laws § 750.301 ........ 43

Pub. L. No. 74-675, 49 Stat. 1491 (1936)............................................6, 27

Pub. L. No. 93-463, 88 Stat. 1389 (1974)..................................................7

Pub. L. No. 95-405, 92 Stat. 865 (1978)....................................................8

Pub. L. No. 97-444, 96 Stat. 2294 (1982)..................................................9

Pub. L. No. 106-554, 114 Stat. 2763 (2000)............................................13

Pub. L. No. 111-203, 124 Stat. 1376 (2010)............................................14

**REGULATIONS**

17 C.F.R. § 1.29..........................................................................................60

17 C.F.R. § 38.151.......................................................................5, 66, 67

17 C.F.R. § 40.2...............................................................................16, 36

17 C.F.R. § 40.3..........................................................................................16

17 C.F.R. § 40.11........................................................................................16

17 C.F.R. § 240.3a68-2..............................................................................36

**OTHER AUTHORITIES**

40 Fed. Reg. 25849 (1975) ..........................................................................48

75 Fed. Reg. 80572 (2010) ..........................................................................67

89 Fed. Reg. 48968 (2024) ..........................................................................42

119 Cong. Rec. 41333 (1973) .......................................................................7

156 Cong. Rec. S5902 (daily ed. July 15, 2010)........................................51

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019) ........................................................14

*In re Blockratize, Inc.*,
2022 WL 73864 (CFTC Jan. 3, 2022) .......... 17, 18, 42

CFTC, *Swaps Report Data Dictionary* .......... 10, 43

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*,
73 Fed. Reg. 25669 (2008) .......... 10, 14

*Consequence*, Webster's New Dictionary (2009) .......... 41

*Contingency*, Webster's New Dictionary (2009) .......... 40

*Event*, Merriam-Webster's Collegiate Dictionary
(11th ed. 2003) .......... 40

*Exclusive*, Webster's New Collegiate Dictionary
(8th ed. 1974) .......... 25

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th .......... 8

*Extent*, Merriam-Webster's Collegiate Dictionary
(11th ed. 2003) .......... 40

*Further Definition of "Swap,"* 77 Fed. Reg. 48208 (2012) .......... 12, 57

*Hr'gs Before the S. Comm. on Agric. & Forestry*,
93d Cong. 685 (1974) .......... 1

H.R. Rep. No. 106-711 (2000) .......... 13

*Jurisdiction*, Webster's New Collegiate Dictionary
(8th ed. 1974) .......... 25

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657, 663 (1982) .......... 6, 7

Philip M. Johnson *et al.*, *Derivatives Regulation* (2d ed. 2026) 6, 9, 10, 14

*Prediction Markets; Public Interest Determinations*,
91 Fed. Reg. 35806 (2026).............................................................. 11, 42

S. Rep. No. 95-850 (1978), *reprinted in*
1978 U.S.C.C.A.N. 2087 ........................................................................ 9

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant QCX LLC d/b/a Polymarket US requests oral argument. This case presents important questions about the preemptive scope of the Commodity Exchange Act and the limited authority of individual States to regulate national, federally licensed derivatives markets.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents federal questions arising under the United States Constitution involving the Commodity Exchange Act of 1936, 7 U.S.C. § 1 *et seq*. Complaint, R.1, PageID.5.

The district court entered its order denying Polymarket US's motion for a preliminary injunction on June 17, 2026. Opinion, R.41, PageID.1130. Polymarket US timely noticed its appeal the same day. Notice of Appeal, R.42, PageID.1131; *see* Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether Polymarket US is likely to succeed in showing that the Commodity Exchange Act preempts enforcement of state gaming laws against federally licensed contract markets.

2. Whether Polymarket US would suffer irreparable injury without a preliminary injunction and whether the public interest and balance of equities favor one.

# INTRODUCTION

May States regulate the Nation's trillion-dollar derivatives exchanges as if they were local casinos? Michigan thinks so. But Congress concluded otherwise fifty years ago: Regulation of nationwide exchanges under "different State laws" would lead to "total chaos." *Hr'gs Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974). So in 1974, Congress amended the Commodity Exchange Act ("CEA") to create the Commodity Futures Trading Commission ("CFTC") and grant the new agency "exclusive jurisdiction" over derivatives traded on federally licensed contract markets. 7 U.S.C. § 2(a)(1)(A). Congress thereby "intended to avoid a diversity of regulations between the C.F.T.C. and the states." *Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980).

This case concerns event contracts, a type of derivative where two parties agree to exchange payments based on the outcome of a particular event. The CFTC has regulated event contracts since the 1990s. In 2010, Congress brought event contracts within the definition of "swap" and placed swaps traded on designated contract markets within the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Polymarket US, a CFTC-licensed contract market, lists CEA-compliant event contracts on events

ranging from interest-rate hikes and elections to the weather and athletic contests. Customers trade those contracts with one another nationwide.

Michigan nonetheless believes that federally regulated event contracts are gambling subject to state gaming laws. On that theory, the State recently sued a different CFTC-regulated contract market in state court, arguing that it could not offer sports-related event contracts in Michigan "because it is not a licensed Michigan casino or a federally authorized Tribal casino." Michigan Complaint, R.14-5, PageID.172.

Because Polymarket US—like every other CFTC-regulated derivatives market in the country—*also* is not a Michigan or Tribal casino, it sought injunctive relief in the district court. It argued that the CEA preempts state efforts to impose state gaming regulation on federally regulated derivatives markets; supplied evidence of irreparable harm that would follow if it were forced to go dark in Michigan; and explained that the public interest supports keeping the State within its statutory and constitutional bounds.

The district court denied the motion, reasoning that Polymarket US's CFTC-approved, CFTC-regulated event contracts were in fact "sports betting products." Opinion, R.41, PageID.1115-17. But in

carving sports-event contracts out of the CEA, the court stripped the Act of its preemptive force, leaving the State free to target *any* derivatives market—from Polymarket US to the Chicago Board of Trade—on the theory that exchange trading resembles gambling. That result conflicts with statutory text and binding precedent.

**Express preemption**. Congress gave the CFTC "exclusive jurisdiction" "with respect to" swaps traded on designated contract markets. 7 U.S.C. § 2(a)(1)(A). A grant of exclusive jurisdiction to an agency "make[s] clear" "unequivocally" that Congress "intends no regulation except its own." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947). Neither Michigan nor the district court identified any other plausible meaning for that grant.

The CFTC's exclusive jurisdiction covers Polymarket US's event contracts. Because Congress gave the CFTC jurisdiction "with respect to" swaps, Michigan cannot evade its jurisdiction by disputing whether particular contracts count. That threshold determination belongs to the CFTC—not state regulators. Anyway, Congress broadly defined "swap" to encompass "any agreement" providing for "any" "payment" based on "an event or contingency associated with a potential financial, economic,

or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As the Third Circuit has already concluded, sports-related event contracts "fit comfortably" within that definition. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026). To reach a different result, the district court imposed an impermissible "extra-textual gloss"—one that renders the definition a null set. Opinion, R.41, PageID.1111-13.

**Field preemption.** The CEA sets out a "comprehensive regulatory scheme" governing every aspect of derivatives trading on a CFTC-licensed contract market. *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980). "Congress delegated to the CFTC" "sweeping authority" to enforce the Act, *CFTC v. Schor*, 478 U.S. 833, 842 (1986), and "plenary power over . . . contract markets," *Curran*, 622 F.2d at 231. Because the CEA does not occupy *other* fields, such as "state contract law," however, the district court held that the field of contract-market trading wasn't preempted either. Opinion, R.41, PageID.1123.

**Conflict preemption.** Both forms of conflict preemption—obstacle and impossibility—apply. Obstacle preemption occurs when a State stands in the way of "the full purposes and objectives of Congress,"

*Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563 (6th Cir. 1998), and a central purpose of the 1974 amendments was to "avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12. State regulation stands in the way of that purpose. As for impossibility, the CFTC has stated that compliance with state laws concerning market access is impossible to square with a contract market's federal obligation to provide "impartial access to its markets and services" "in a non-discriminatory manner." 17 C.F.R. § 38.151(b).

* * *

The district court's conclusion that nothing in the CEA preempts States from enforcing their gambling laws against designated contract markets conflicts with the statute Congress wrote and returns to the state-by-state chaos Congress sought to eliminate. This Court should reverse the order denying a preliminary injunction.

## STATEMENT OF THE CASE

### A. Congress Grants The CFTC Exclusive Jurisdiction Over Exchange-Traded Derivatives.

Derivatives are contracts whose value derives from something else, "such as a physical commodity, interest rate, . . . stock index," or even an

"incident[] that take[s] place beyond the control of the contracting parties." Philip M. Johnson *et al.*, *Derivatives Regulation* § 1.02[A], [C] (2d ed. 2026). Today, they are traded on all manner of goods, assets, values, and metrics, "providing risk management, hedging, and speculative opportunities of use throughout the economy." *Id.* § 3.01.

But they nearly never got off the ground. From the start, States eyed such contracts with suspicion, regulating or prohibiting them as unlawful gambling. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982). "[A]n option to buy or sell at a future time," the Michigan Supreme Court once remarked, "is a gambling contract pure and simple." *Demary v. Burtenshaw's Estate*, 131 Mich. 326, 330 (1902).

When Congress passed the CEA in 1936, it did little to prevent state involvement. The Act provided it would not "'impair'" the enforcement of "'any State law applicable to any transaction'" covered by the Act. *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947) (quoting Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936)). And because it contained no "declaration by Congress" that the regulatory system was "exclusive of

state regulation," States remained free to "supplement[] or bolster[]" the federal scheme. *Id.* at 253, 255.

By the 1970s, derivatives trading had become too important to the national economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges. 119 Cong. Rec. 41333 (1973). It was time "for a significant change in the parameters of Federal authority over the exchanges." *Id.*

Congress responded with the Commodity Futures Trading Act of 1974, which created the CFTC and established "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355-56 (1982); *see* Pub. L. No. 93-463, 88 Stat. 1389 (1974).

The 1974 Act made two changes that would reshape the derivatives industry. *First*, it "wholly and unequivocally eliminated" the language the Supreme Court had relied on to permit state regulation. *Van Wart*, *supra*, at 692-93; § 402(d), 88 Stat. at 1413. *Second*, it gave the CFTC "exclusive jurisdiction with respect to . . . agreements . . . involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. § 201(b), 88 Stat. at

1395. This exclusive jurisdiction would "supersede" and "limit the jurisdiction" of "regulatory authorities under the laws of . . . any State." *Id.*

Federal and state courts immediately recognized that the CFTC's exclusive jurisdiction "preempt[ed] the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (collecting cases), including "state gambling laws," against CFTC-regulated exchanges, *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981). As this Court explained, "[t]he idea that the C.F.T.C. should regulate the area was firmly expressed." *Kelly*, 691 F.2d at 803.

State officials took note, demanding that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *E.g.*, *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 379 (1978).

Congress yielded little. A 1978 amendment allowed States to sue for violations of the CEA. Pub. L. No. 95-405, § 15, 92 Stat. 865, 872 (codified at 7 U.S.C. § 13a-2(1)). But States could not sue "a contract market." *Id.* And a 1982 amendment permitted the application of "State

statute[s] . . . to any transaction . . . that is *not* conducted on or subject to the rules of" a federally regulated exchange—*i.e.*, off-exchange transactions. Pub. L. No. 97-444, § 229, 96 Stat. 2294, 2318 (codified at 7 U.S.C. § 16(e)(1)(B)) (emphasis added). But "[p]lenary authority to register, regulate, and discipline the contract markets" remained "reserved to the Commission." S. Rep. No. 95-850, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113.

### B. Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts.

**1.** By the end of the twentieth century, the CFTC's jurisdiction over "commodities" had grown to include "an open-ended, virtually unlimited array of 'all other goods and . . . all services, rights, and interests in which contracts for future delivery are . . . dealt in.'" Derivatives Regulation, *supra*, § 2.03[A] (quoting 7 U.S.C. § 1a(9)(A)). New kinds of "innovative [financial] instruments," all subject to "the Commission's regulatory jurisdiction," emerged in this "essentially unbounded field." *Id.*

Swaps were one such instrument. "[T]he basic form of a swap is a transaction in which two parties agree to exchange"—*i.e.*, swap—payment "on a specific date" based on "an uncertain variable."

Derivatives Regulation, *supra*, § 1.02[D]. For example, in a credit default swap, one party agrees to make a payment "should a credit event occur" in exchange for periodic payments from the other party. CFTC, *Swaps Report Data Dictionary*.[1]

Event contracts were another innovation, which Congress in 2010 expressly defined as a type of swap. They "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25669 (2008). The CFTC has regulated event contracts since at least 1992, when it permitted a "real-money event market[]"—which continues to operate today—to offer "contracts based on political elections," among other subjects. *Id.* at 25670 & n.4.

Event contracts are typically binary: One party takes the "yes" position that an event will occur; the other takes the "no" position. The contract specifies the value to be paid and an expiration date. When the

---

[1] Available at https://tinyurl.com/yn3nej7t (last visited Aug. 17, 2026).

contract expires, the party whose prediction was correct receives the return. Parties might, for example, take a position on whether Lansing will get more than 3 feet of rain (the approximate yearly average) in 2026. If Lansing sees 4 feet, the "yes" position is paid and the "no" position is not. Price tracks expectations: If traders think the outcome increasingly likely, demand for "yes" positions and the price will rise; if the outcome seems less likely, both will drop.

Prediction markets, where event contracts are traded, serve several functions. Event contracts can be used to hedge risk and facilitate price discovery while generating real-time information about future events through market pricing. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35807 (2026). For example, a business facing loss of a tax benefit if a candidate wins could hedge that risk through an election contract while using its price as one data point to guide business decisions based on the probable outcome. Like any other derivative, event contracts may also be used for "speculation." *Id.* at 35,808 n.24; *see Curran*, 456 U.S. at 390 (Congress "intended" "the speculator" "to be protected by the statute as much as the hedger").

Sports-related event contracts are fundamentally different than sportsbook bets. Event contracts are tradable: market participants buy and sell contracts with one another on an exchange, with prices formed through those transactions. Polymarket US matches those orders; it does not take the other side of the trade or profit based on the outcome. Sportsbook bets, by contrast, are wagers against the sportsbook, which sets the odds, and cannot be transferred to another bettor. The CFTC has treated tradability as a key feature distinguishing swaps from ordinary transactions. *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,248 (2012).

**2.** "[T]o eliminate uncertainties surrounding application of the [CEA] to several innovative financial instruments," Congress in the 1990s authorized the CFTC "to exempt specific instruments and transactions from coverage under the CEA." *Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 322 F.3d 1039, 1056 (9th Cir. 2003). The CFTC thus "promulgated regulations exempting eligible swap agreements from CEA coverage." *Id.*

Congress also carved out certain event contracts. It classified as "excluded commod[ities]" any "occurrence, extent of an occurrence, or

contingency . . . that is . . . beyond the control of the parties" and "associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, § 101(4), 114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)). Such commodities would not be "govern[ed]" by the CEA's substantive provisions. § 103, 114 Stat. at 2763A-377-78.

Because exempted swaps and excluded commodities fell outside the CFTC's jurisdiction, there was a risk they would once more be subject to state gaming laws. *See Thrifty Oil*, 322 F.3d at 1057-58. Congress therefore extended the CEA's preemption of state gaming law even to transactions it had placed outside the Act's substantive reach, providing that the CEA "supersede[s] and preempt[s] the application of" state "gaming" laws to "transaction[s] that" were "excluded" or "exempted" from the Act. 7 U.S.C. § 16(e)(2). The Committee report explained that the CEA already "supersedes and preempts" state laws for "transactions conducted on" a designated contract market, and that this provision extends that preemption to certain off-exchange transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000).

**3.** The 2008 financial crisis ended this period of deregulation. "When that crisis occurred, many saw the previous lack of regulation in

swaps"—credit default swaps in particular—"as a contributing cause." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). At the same time, the CFTC was considering how best to regulate event contracts. *See* 73 Fed. Reg. at 25673. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 addressed both developments simultaneously: Congress wrote a broad definition of "swap" encompassing event contracts and placed contract-market-traded swaps within the CFTC's exclusive jurisdiction.

*First*, the Act added contract-market-traded swaps to the derivatives within the CFTC's exclusive jurisdiction. *See* Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010). Since then, the CFTC has exercised "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). Such swaps stand "on the same exclusive jurisdictional footing as exchange-traded commodity futures." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019).

*Second*, the Act "add[ed] a very broad definition of the term 'swap'" and included "event contracts" within it. Derivatives Regulation, *supra*,

§ 2.06. The definition covers "any agreement" providing for "any" "payment" based "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." § 721(a)(21), 124 Stat. at 1666 (codified at 7 U.S.C. § 1a(47)(A)(ii)).

*Third*, the Act introduced what is known as the "Special Rule." The Special Rule concerns "event contracts" based on certain underlying events, such as "terrorism," "assassination," "war," "gaming," and any "activity that is unlawful under Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). It permits—but does not require—the CFTC to ban the listing of such contracts if the CFTC determines that they "are contrary to the public interest." *Id.*

### C. The CEA Establishes A Comprehensive Regulatory Framework For Event Contracts.

For more than a decade, the CFTC has exercised comprehensive regulatory authority over designated contract markets and event contracts traded on them. To qualify as a designated contract market, an entity must demonstrate to the CFTC that it "complies with" the CEA's 23 "core principles." 7 U.S.C. §§ 7(d), 8(a). Those principles

require contract markets to establish and enforce rules to prevent price manipulation, market disruption, and other abusive practices. 7 U.S.C. § 7(d)(4), (5), (12).

The CEA authorizes the CFTC to "review and approv[e] . . . event contracts" for "trading" on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). Contract markets may seek pre-approval or certify a contract's compliance with the CEA and the CFTC's requirements. *Id.* § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC may investigate, stay, or amend contracts even after listing. 17 C.F.R. § 40.2(c).

The CFTC also possesses "sweeping [enforcement] authority," *Schor*, 478 U.S. at 842, including to suspend or revoke a contract market's designation, 7 U.S.C. §§ 7b, 8(b). It may promulgate rules to "prevent price manipulation." *Id.* § 5(b). And Congress directed it "to further define the term[] 'swap,'" 15 U.S.C. § 8321(b); *accord id.* § 8302(d)(1).

### D. Polymarket US Operates A Designated Contract Market Subject To The CFTC's Exclusive Jurisdiction.

The CFTC granted Polymarket US its designation as a contract market in July 2025. Clifford Declaration, R.14-1, PageID.92 ¶ 1. That

designation reflects a rigorous federal determination that Polymarket US could and would satisfy all federal requirements governing market integrity, transparency, financial safeguards, and customer protection. After receiving its CFTC designation as a contract market, Polymarket US represented to the CFTC that "all" its event contracts would fall "within the definition of 'swap' under the [CEA]." No-Action Letter, R.14-10, PageID.194.

Polymarket US specializes in event contracts concerning real-world events that matter to the public. Starting in September 2025, it certified with the CFTC financial, election, sports, and other event contracts. Clifford Declaration, R.14-1, PageID.93 ¶ 6.

Polymarket US's CFTC designation and contract certifications mark the culmination of a years-long effort to comply with the CEA and CFTC regulations. In 2022, the CFTC took the position that event contracts concerning "current events" then offered by Polymarket US's parent company "constitute[d] swaps under the CFTC's jurisdiction." *In re Blockratize, Inc.*, 2022 WL 73864, at *1-2 (CFTC Jan. 3, 2022). The parent company thereafter agreed to offer future event contracts in the United States only through a CFTC-registered market—either a

designated contract market or a swap execution facility. *Id*. at *8-9. No State or state regulatory authority objected to this order.

### E. Polymarket US Seeks Injunctive Relief After The State Sues Another CFTC-Regulated Contract Market.

On March 3, 2026, the State sued KalshiEX, another designated contract market, in Michigan state court, alleging that it was "engage[d] in unlicensed gambling" in violation of state law. Michigan Complaint, R.14-5, PageID.154 ¶ 2. The State sought fines and an injunction against "engaging in [an] internet sports betting operation." Michigan Complaint, R.14-5, PageID.173.

Polymarket US brought this lawsuit the next day. Complaint, R.1, PageID.4. On March 6, it moved for a temporary restraining order and preliminary injunction, arguing that the CEA preempts state regulators' enforcement of state gaming law against CFTC-designated contract markets. PI Motion, R.14, PageID.52.

After declining to issue a temporary restraining order, TRO Opinion, R.17, PageID.227, the district court denied a preliminary injunction, Opinion, R.41, PageID.1097. It held that Polymarket US's event contracts are not "swaps" under the CEA and that, even if they

were, the CEA would not preempt Michigan's gambling laws under any theory. Because it believed Polymarket US unlikely to succeed on the merits, it concluded that the other preliminary-injunction factors also counseled against relief. Polymarket US timely appealed. Notice of Appeal, R.42, PageID.1131.

## SUMMARY OF ARGUMENT

The district court abused its discretion in denying Polymarket US's motion for a preliminary injunction. Polymarket US is likely to succeed on the merits because the CEA preempts Michigan's enforcement of state gaming laws against CFTC-designated contract markets under three theories of preemption. The remaining factors likewise favor an injunction.

**I.A.** In 1974, Congress granted the CFTC "exclusive jurisdiction" over derivatives traded on federally licensed contract markets, 7 U.S.C. § 2(a)(1)(A). That language, the Supreme Court has long recognized, shows Congress's unequivocal declaration that it "intends no regulation except its own." *Santa Fe*, 331 U.S. at 236. The savings clause in section 2 confirms this reading, providing that state regulatory authority is preserved "[e]xcept as hereinabove provided"—*i.e.*, except

where the CFTC's exclusive jurisdiction applies. 7 U.S.C. § 2(a)(1)(A). The district court's limited reading of the exclusive-jurisdiction provision renders it toothless and is irreconcilable with the text and structure of the statute.

Moreover, the district court erred in concluding that Polymarket US's event contracts are not "swaps." As an initial matter, Congress granted exclusive jurisdiction "with respect to" swaps. That broad grant encompasses the CFTC's determination whether event contracts are swaps and its discretion to stay listing if they are not. Challenges to the CFTC's exercise of that jurisdiction must be brought under the Administrative Procedure Act—not through enforcement actions under the laws of 50 different states.

In any event, the district court *agreed* that based on the text of the statute Polymarket US's products were swaps. Opinion, R.41, PageID.1103 n.4. There was thus no permissible basis for concluding that they lay outside the CFTC's exclusive jurisdiction.

**I.B.** The CEA establishes a comprehensive regulatory scheme governing every aspect of trading on designated contract markets—from designation requirements and participant eligibility and access

standards to contract listing, market surveillance, and enforcement. Congress made the CFTC the single regulator over the narrow field of contract-market trading. The district court observed that the CEA provides for state regulators' ability to enforce the Act, but state enforcement power does not apply to a contract market. And, as this Court has recognized, Congress can still occupy a field even where the statute includes a savings clause.

**I.C.** Michigan's gaming laws also pose an obstacle to Congress's objectives by allowing States to veto the self-certification process—replacing CFTC review with approval by 50 state regulators—and by creating a patchwork of inconsistent state regulations that Congress sought to eliminate. Impossibility preemption also applies because federal law requires contract markets to provide impartial, non-discriminatory access to their markets, which the CFTC interprets to bar geographical limits on access. Yet Michigan law would demand just that: geographic restrictions on market participation, along with state-mandated platform certification, security controls, and other requirements.

**II.** The remaining preliminary-injunction factors also favor Polymarket US. Without an injunction, Polymarket US faces irreparable harm by having to choose between the Scylla of violating state law and the Charybdis of forfeiting its right to operate in Michigan. It would also suffer reputational injury and the loss of customer goodwill, both of which are irreparable harms. The public interest lies in the correct application of federal law and in preventing the regulatory chaos Congress sought to eliminate.

## STANDARD OF REVIEW

This Court reviews a "district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion," evaluating its "legal determinations, including the likelihood of success on the merits . . . de novo." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 607 (6th Cir. 2024) (cleaned up). Factual findings are reviewed "for clear error." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007).

## ARGUMENT

The district court abused its discretion in denying Polymarket US's motion for a preliminary injunction. In deciding "whether to grant a

preliminary injunction," courts ask whether the plaintiff is likely to succeed on the merits, whether it would likely suffer irreparable harm absent relief, whether the balance of equities tips in its favor, and whether "the public interest" favors an injunction. *Tennessee*, 104 F.4th at 607. "[B]ecause the Government is the opposing party," "[t]he last two factors . . . merge." *Id.* at 613 (cleaned up).

## I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions.

The Constitution makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Congress may therefore "preempt state law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), even laws "deep-seated in the police power of the States," *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638 (1973).

There are three kinds of preemption. *First*, Congress can withdraw state power through "[e]xpress preemption provisions," which "indicate Congress's preemptive intent through language rather than through a statute's structure and purpose." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637-38 (6th Cir. 2025). *Second*, "[e]ven without an express provision for preemption," it can be

inferred that "Congress intend[ed] federal law to occupy the field." *Crosby*, 530 U.S. at 372. *Third*, preemption arises where federal and state law "directly conflict." *Churchill Downs*, 162 F.4th at 638.

Under each kind of preemption, the CEA preempts state enforcement actions brought under Michigan's gambling laws.

### A. The CEA Expressly Preempts State Regulation Of Event Contracts Traded On CFTC-Designated Contract Markets.

#### 1. Congress Expressly Preempted State Law When It Gave The CFTC "Exclusive Jurisdiction."

Express preemption "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). No "particular linguistic formulation" is required. *Murphy v. NCAA*, 584 U.S. 453, 478 (2018). What matters is Congress' preemptive intent is "discernible." *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). And where a statute "'contains an express pre-emption'" provision, courts "do not invoke any presumption against pre-emption." *Franklin*, 579 U.S. at 125.

**a.** Section 2 is an express-preemption provision. It grants the CFTC "exclusive jurisdiction . . . with respect to . . . agreements, [and] transactions involving swaps . . ., traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Jurisdiction is "the authority of a sovereign power to govern or legislate." *Jurisdiction*, Webster's New Collegiate Dictionary (8th ed. 1974). And where jurisdiction is "exclusive," it "necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992); *see Exclusive*, Webster's New Collegiate Dictionary (8th ed. 1974) ("sole," "single," "excluding others from participation").

The Supreme Court has for decades used "exclusive jurisdiction" as shorthand for preemption. *E.g.*, *N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 89 (1963); *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). So has this Court just last year. *E.g.*, *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002).

Congress chose the exclusive-jurisdiction language deliberately. In *Rice v. Board of Trade of City of Chicago*, the Supreme Court held that

the pre-1974 CEA did not preempt state law. *See supra* p.6. Explaining why, the Court compared the CEA's wording to that of the federal Warehouse Act, the statute at issue in *Rice v. Santa Fe Elevator Corp.*, a "companion case[]" decided the same day. *Rice v. Bd. of Trade*, 331 U.S. at 248.

In *Santa Fe*, the Court held that Congress gave the Warehouse Act preemptive force through two deliberate steps: It (1) eliminated a provision directing that "nothing . . . shall be construed to . . . impair" the "operation of the laws of any State," and (2) added a provision giving the federal government "exclusive" "jurisdiction." *Santa Fe*, 331 U.S. at 222-24, 232-33. Those "amendments" made it "unequivocally . . . clear that [Congress] intend[ed] no regulation except its own." *Id.* at 236.

The *absence* of similar language was dispositive in *Rice v. Board of Trade*: The CEA then lacked "a declaration by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation," so States remained free to supplement the federal scheme. 331 U.S. at 249, 253.

Congress followed the *Santa Fe* roadmap in 1974. *First*, it eliminated the CEA provision preserving a broader role for state

regulation. *Compare* Pub. L. No. 74-675, § 4(c), 49 Stat. 1491, 1494 (1936) ("Nothing in this section . . . shall be construed to impair any State law applicable to any [exchange-traded] transaction."), *with* § 402(d), 88 Stat. at 1413 (deleting this language). *Second*, it vested the CFTC with "exclusive jurisdiction" over derivatives traded on a designated contract market. § 201, 88 Stat. at 1395. Through these two steps, Congress "terminat[ed] the dual system of regulation," subjecting CFTC-regulated transactions "to regulation by one agency and by one agency alone." *Santa Fe*, 331 U.S. at 234. And the 1974 Act's "Joint Explanatory Statement of the Committee of Conferees" confirmed that "the exclusive grant of jurisdiction to [the CFTC] . . . would preempt the field insofar as futures regulation is concerned." *Kelly*, 691 F.2d at 804 n.12.

In short, "in 1974," Congress had prevented "a diversity of regulations between the C.F.T.C. and the states" by "preempti[ng] [] state regulatory activity." *Kelly*, 691 F.2d at 804 n.12.[2]

---

[2] A motions panel in a different case denied an injunction pending appeal, concluding that although the issue was "close," the CEA likely did not preempt Ohio's gambling laws. *KalshiEx LLC v. Schuler*, 2026 WL 1295806, *3-6 (6th Cir. Apr. 24, 2026). This non-binding decision did not benefit from full briefing—for example, the parties there did not raise

**b.** Section 2's savings clause confirms that the exclusive-jurisdiction provision preempts state law. It provides that section 2 does not "supersede" the "jurisdiction" of the "regulatory authorities under the laws of . . . any State," "*[e]xcept as hereinabove provided*"—that is, except where Congress granted exclusive jurisdiction to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). As the Third Circuit explained, this "clause indicates that swaps" traded on a contract market "fall under the CFTC's exclusive jurisdiction." *Flaherty*, 172 F.4th at 231. The savings clause thus preserves, for example, other regulators' authority over securities exchanges and off-designated-contract-market transactions.

**c.** Relying on a series of flawed interpretive moves, the district court concluded that section 2 has no preemptive effect.

*First*, although the Supreme Court "do[es] not require Congress to employ a particular linguistic formulation when preempting state law," the district court required one. *Murphy*, 584 U.S. at 478. The court did not take the exclusive-jurisdiction provision at face value because

---

*Kelly v. Carr* nor explain the connection between the two *Rice* decisions and the 1974 amendments. *Cf. R.E. Dailey & Co. v. John Madden Co.*, 983 F.2d 1068, 1068 n.1 (6th Cir. 1992) (unpublished "decisions of motions panels" do not bind future merits panels).

"'jurisdiction' is usually used in the judicial sense." Opinion, R.41, PageID.1120. But section 2 itself forecloses that reading. One of its savings clauses provides, "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts," *see* 7 U.S.C. § 2(a)(1)(A), meaning that the exclusive-jurisdiction provision *cannot* refer to the jurisdiction of courts. Rather, section 2 unambiguously uses "jurisdiction" to refer to *regulatory* power. *See id.* ("nothing contained in this section shall . . . supersede . . . the *jurisdiction* at any time conferred on . . . *regulatory authorities*" (emphases added)). And, elsewhere, the CEA has an entire section titled "Jurisdiction of [the] States," delineating the enforcement actions States may bring under the CEA (but not, with a limited exception not relevant here, against a designated contract market). *See* 7 U.S.C. § 13a-2.

*Second*, the district court reasoned that other CEA provisions address preemption, using different formulations. *See* Opinion, R.41, PageID.1120. For example, the CEA "prohibit[s] state regulation of swaps as insurance contracts." *Id.* at PageID.1105; *see* 7 U.S.C. § 16(h)(2). Likewise, it "preempt[s] the application of any State . . . law

that prohibits or regulates gaming" to excluded or exempt commodities (*i.e.*, those outside the CFTC's exclusive jurisdiction). 7 U.S.C. § 16(e)(2).

But "[t]he fact that Congress chose to use certain language . . . in one amendment . . . hardly means it was 'foreclosed . . . from using different language to accomplish the same goal' in a different set of amendments to the same law." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 52 (2024). Nor is there any "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing," *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013)—*particularly* where "Congress drafted" the provisions "at different times," *Pulsifer v. United States*, 601 U.S. 124, 151 (2024).

Just so here. Congress added the exclusive-jurisdiction provision in 1974, when this Court considered its preemptive effect "firmly expressed." *Kelly*, 691 F.2d at 803. Decades later, Congress added the provisions the district court invoked. *See supra* p.13. Congress's differing formulations do not make the preemption "reflected in [section 2] any less clear." *Kirtz*, 601 U.S. at 52.

*Third*, neither the district court nor the State offered any plausible account of what the exclusive-jurisdiction provision does, if not preempt state law. The court speculated that it bars States from enforcing "the CEA" but not "state law." Opinion, R.41, PageID.1122. But the savings clause confirms that the CFTC's exclusive jurisdiction "supersede[s]" the "jurisdiction" of state "regulatory authorities" to enforce not just "the laws of the United States" but also "the laws . . . of *any State*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

The court's alternative explanation—that maybe "exclusive jurisdiction" merely keeps the Securities and Exchange Commission ("SEC") at bay, *see* Opinion, R.41, PageID.1120-21—likewise cannot be squared with the savings clause. It also ignores that the CEA separately carves out security-based swaps as distinct instruments regulated by the SEC. 7 U.S.C. § 1a(47)(B)(x). Relying on *Curran*, the court asserted that "'[t]he purpose of the exclusive-jurisdiction provision' in the CEA 'was to separate the functions of the Commission from those of the [SEC] and other regulatory agencies.'" *Id.* at PageID.1120 (quoting *Curran*, 456 U.S. at 386). But that description from *Curran* was not about the purpose of the provision as ultimately enacted. Instead, *Curran* described the

purpose of the earlier "bill passed by the House." 456 U.S. at 386. The Senate then "revised" the bill "to make it clear that state as well as federal regulation was preempted." *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 218 (D. Kan. 1979). And the "Senate amendment"—that restricted both state and federal regulation—prevailed. *Curran*, 456 U.S. at 387.

*Finally*, the district court suggested that "exclusive jurisdiction" may mean nothing at all. Because a later-added section allows States "to sue for certain violations of the CEA," the court suggested that "the 'exclusive' jurisdiction may not be so exclusive." Opinion, R.41, PageID.1122 (citing 7 U.S.C. § 13a-2(1)). But that section expressly does not apply to purported CEA violations by "contract market[s]"—thereby preserving the CFTC's exclusive jurisdiction over those markets. 7 U.S.C. § 13a-2(1).

* * *

Whatever Michigan's views about sports-related event contracts, section 2, as written, preempts the application of the State's gaming laws. By not giving full effect to that centerpiece of the 1974 Act, Michigan's approach allows any State to apply its gambling laws to any CFTC-

regulated derivative traded by any exchange—not just those disfavored by Michigan. The derivatives industry, however, cannot function if its members are regulated like Motor City Casino.

### 2. The CFTC's Exclusive Jurisdiction Extends To The Determination As To Whether A Certified Contract Is A Swap.

The district court's alternative holding that Polymarket US's sports-related event contracts are not "swaps" likewise usurped the CFTC's authority. Text and context make clear that Congress granted the CFTC, not the States, exclusive jurisdiction to determine whether contracts certified as swaps are in fact swaps. By permitting Michigan to ignore that determination and litigate the issue in state court, the district court erred.

**a.** The CFTC's exclusive jurisdiction is "with respect to" contract-market-traded "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). The phrase "with respect to" "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Mullin v. Doe*, 146 S. Ct. 2121, 2133 (2026) (cleaned up). The CFTC's exclusive jurisdiction thus extends beyond

swaps to matters relating to swaps—including the threshold determination whether an event contract *is* a swap.

Even before the 1974 Act, the Supreme Court recognized that "Congress ha[d] placed within the jurisdiction of the" CFTC's predecessor agency the authority to answer "questions about the scope, meaning, and significance of" the CEA as applied to particular facts. *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 305-06 (1973). Such questions "should be routed in the first instance to the agency." *Chi. Mercantile Exch. v. Deaktor*, 414 U.S. 113, 115 (1973). The Court therefore reversed a lower court for allowing an antitrust suit against a contract market to proceed without first "afford[ing]" the agency an opportunity "'to unravel the intricate and technical facts'" involved. *Curran*, 622 F.2d at 236.

Congress later clarified that the agency's jurisdiction was "exclusive," 7 U.S.C. § 2(a)(1)(A)—and that it extended to the determination of the scope of the term "swap." Congress *twice* directed the CFTC to "further define the term[] 'swap.'" 15 U.S.C. §§ 8302(d)(1), 8321(b). It barred "State[s]" from using suits against "contract market[s]" to advance new readings of the CEA. 7 U.S.C. § 13a-2(1). And it directed that the "*Commission* shall approve a new contract" for listing

"unless *the Commission* finds that the new contract . . . would violate" the CEA and CFTC regulations. *Id.* § 7a-2(c)(5)(B) (emphases added); *see also id.* § 7a-2(c)(4)(A) ("A registered entity may request that the Commission grant prior approval to any new contract.").

Permitting States to decide what counts as a swap in an enforcement action "cannot be reconciled with th[is] decisionmaking scheme." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011). "[S]uch a right to sue, with its implied threat of sanctions for failure to comply with what the courts of each State consider" an appropriate interpretation of swap, "is plainly contrary" to "the Commission's exclusive jurisdiction." *Chi. & N.W. Transp.*, 450 U.S. at 328, 331. As the State all but concedes, the premise of a state-court suit would be that the event contracts at issue are not "compliant with the CEA and its regulations" and that the contract market falsely "self-certified" them as swaps. Opposition, R.21, PageID.289. The CEA forecloses that approach.

"Federal courts" remain free to "review agency action (or a final rule declining to take action) to ensure compliance with the statute Congress enacted." *Am. Elec. Power*, 564 U.S. at 426; *see, e.g.*, *KalshiEX, LLC v.*

*CFTC*, 2024 WL 4164694, at *5-7 (D.D.C. Sept. 12, 2024). If a State believes that a contract market has improperly certified a contract as a swap—or that the CFTC wrongly approved or failed to "stay the listing" of a contract, 17 C.F.R. § 40.2(c)—the State may seek relief from the CFTC and then federal courts. The State claimed below that such an "administrative process" "does not exist." Opposition, R.21, PageID.287. But longstanding CFTC regulations permit "[a]ny person" to request the agency's interpretation of whether a particular agreement is a "swap." 17 C.F.R. § 240.3a68-2(a), (a)(1). And "[t]he critical point is that Congress delegated to" the CFTC exclusive jurisdiction with respect to those questions "in the first instance." *Am. Elec. Power*, 564 U.S. at 426-27. The CEA leaves no room for States to short-circuit that "order of decisionmaking." *Id.* at 427.

**b.** Invoking *Loper Bright Enterprises v. Raimondo*, the district court treated Congress's express delegation to the CFTC to define swaps as irrelevant—and said nothing about the order of decisionmaking *Ricci* articulated. But even after *Loper Bright*, deference remains appropriate where, as here, a "statute[] expressly delegate[s] to an agency the

authority to give meaning to a particular statutory term." 603 U.S. 369, 394-95 (2024) (cleaned up).

The court also reasoned that its "'role'" as a "'reviewing court' is to 'fix the boundaries of the delegated authority.'" Opinion, R.41, PageID.1114 (quoting *Loper Bright*, 603 U.S. at 395). But that is "the role of the reviewing court *under the APA*." *Loper Bright*, 603 U.S. at 395 (emphasis added). "[I]ndividual district judges" cannot "issu[e] ad hoc, case-by-case" interpretations outside that process. *Am. Elec. Power*, 564 U.S. at 428.

Markets require predictability based on rules issued by those familiar with the derivatives industry, not ad hoc decisionmaking by a single judge—or, worse, judges and juries across 50 States and endless municipalities, *see* Complaint, *City of Baltimore ex rel. Thompson v. QCX LLC*, No. C-24-CV-26-005535 (Md. Cir. Ct. Aug. 13, 2026). That is why the CFTC has exclusive jurisdiction "with respect to" swaps. 7 U.S.C. § 2(a)(1)(A). By assuming the regulator's role and defining "swap" in the first instance, the district court erred.

### 3. In Any Event, Polymarket US's Event Contracts Are Swaps.

If this Court agrees with KalshiEX that event contracts independently fall within the CFTC's "exclusive jurisdiction" as "agreements" traded on a designated contract market, it need not decide whether Polymarket US's event contracts are also swaps. 7 U.S.C. § 2(a)(1)(A); *see* Appellant Br. 45-46, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 5, 2026).

Regardless, Polymarket US's contracts are "swaps" subject to the CFTC's exclusive jurisdiction. As the Third Circuit concluded, because "sports-related event contracts are traded on a CFTC-licensed [designated contract market] and depend on event outcomes associated with economic consequences, they fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction." *Flaherty*, 172 F.4th at 228. Even the dissent agreed that "[a] plain reading of the Act's text suggests that [the] sports-event contracts fit comfortably within the statutory definition." *Id.* at 233 (Roth, J., dissenting). The district court concluded otherwise by departing from the text and supplying its own "extra-textual gloss." Opinion, R.41, PageID.1112-13.

**a.** To ensure effective regulation of swaps after the 2008 financial crisis, Congress "defined 'swap' broadly." *Phillips*, 155 F.4th at 113. With six overlapping definitions, it covered every variety of swap, including transactions that become "known to the trade as a swap" "in the future." 7 U.S.C. § 1a(47)(A)(iv). And Congress directed the CFTC to "further define" swap to "include transactions . . . that have been structured to evade" Congress's broad regulatory goals. 15 U.S.C. § 8321(b).

Event contracts are expressly encompassed within the statutory definitions. The term swap includes "any agreement" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The "ordinary, contemporary common meaning" of "th[is] language" is expansive. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025).

*Any agreement . . . any payment*. The repeated use of "any" confirms the definition's breadth. *See Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002).

*Event or contingency*. That language is broad enough to cover, say, the result of the Federal Reserve's decision on interest rates or the outcome of an athletic event. The ordinary meaning of "event" includes an "outcome," "something that happens" or "a noteworthy happening." *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Similarly, a "contingency" is a "dependence on chance" or "possible or chance event." *Contingency*, Webster's New Dictionary (2009). And "extent"—in "extent of occurrence"—implies a "range" of outcomes. *See Extent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). So "if 'occurrence' and 'nonoccurrence' capture whether an event" or contingency "happens, 'the extent of the occurrence' extends to how an event resolves." *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *4 (D. Ariz. May 5, 2026). In other words, the definition "reaches how an event unfolds, not just whether it happens." *Id.*

*Associated with potential financial consequences*. The second half of the clause is intentionally broad. Take the words "associated with." The Supreme Court has explained that similar language "sweeps broadly," covering direct and indirect "connection[s]" so long as they are not "tenuous, remote, or peripheral." *Chevron USA Inc. v. Plaquemines*

*Par. La.*, 146 S. Ct. 1052, 1060-61 (2026) (discussing "relating to"); *see Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) ("Courts have [] described the term 'relating to' as equivalent to the phrase[] . . . 'associated with.'"). And a "consequence" is "a result" or "effect." *Consequence*, Webster's New Dictionary (2009). Broader still, Congress dropped the requirement that the occurrence be "beyond the control of the parties," *supra* p.13, and required only a "potential"—not actual or probable—"financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii).

Given all this, "sports-event contracts fit comfortably within the statutory definition." *Flaherty*, 172 F.4th at 227. Consider a contract based on the winner of the Super Bowl, an event associated with financial and economic consequences. Winning causes a surge in the team's valuation, retailers' sales of team merchandise, and the hometown economy. The Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels piggybacking off that success. PI Motion, R.14, PageID.83. And retailers regularly tie promotions to game results, including the winning team, final score, and game duration. *Id.* & n.7.

For good reason, then, the CFTC has consistently recognized that exchange-traded event contracts—including sports-related event contracts—are swaps. *See Loper Bright*, 603 U.S. at 386 ("[T]he longstanding 'practice of the government'—like any other interpretive aid—'can inform a court's determination of what the law is.'"). The agency so determined when it required Polymarket US's parent company to offer event contracts only on a CFTC-licensed designated contract market. *Blockratize*, 2022 WL 73864, at *1-2, 8. That accorded with the understanding of every administration since Dodd-Frank: Event contracts lie within the CFTC's "exclusive jurisdiction." 89 Fed. Reg. 48968, 48977 n.84 (2024); *see* 91 Fed. Reg. at 35815-16 (summarizing CFTC regulation of election- and sports-related event contracts).

**b.** The district court apparently agreed, "based solely on the text" (or at least its ordinary meaning), that Polymarket US's products "were 'swaps.'" Opinion, R.41, PageID.1103 n.4. That should have been the end of the matter. "The plain language of the statute" yields "a fairly straightforward" guide to the meaning of paragraph (A)(ii). *Benson*, 136 F.4th at 625. "[T]he language of the statute is clear, [and] the court" should have "applie[d] the statute as written." *Id.*

The court instead applied what it called an "extra-textual gloss." Opinion, R.41, PageID.1111, 1113. In place of the textual requirement that potential financial consequences be "associated with" the relevant event, 7 U.S.C. § 1a(47)(A)(ii), the court determined that those consequences must "be 'inherently joined or connected with'" the event, Opinion, R.41, PageID.1112. And it grafted onto the statute a "gambling" exception. *Id.* at PageID.1105.

Those judicial amendments "find[] no support in" subsection 1a(47) "and [are] not anchored to the common meaning of the statute"—enough to reject them. *Benson*, 136 F.4th at 626. The gambling exception, in particular, would spell an end to federal regulation of swaps, not just event contracts. Michigan, like other States, defines illegal gambling so broadly that it easily sweeps in swaps. *See*, *e.g.*, Mich. Comp. Laws § 750.301 (imprisonable offense to enter a contract "where the payment [is] contingent upon . . . the happening of any event not known by the parties to be certain"). That definition could, for example, encompass a credit default swap, which provides for payment "should a credit event occur." CFTC, *Swaps Report Data Dictionary*, *supra*. If state treatment of a contract as gambling sufficed to remove it from the statute's sweep,

the CFTC would soon have no swaps left to regulate. That result would fracture the uniform federal regulation on which national financial markets depend.

**c.** None of the district court's explanations for its extra-textual gloss holds up. *First*, the court ascribed to Polymarket US a position it has expressly disavowed: that "associated with" "allow[s] the chains of association to extend to infinity." Opinion, R.41, PageID.1111. And because "*[a]nything* can potentially have economic ramifications given enough attenuation and happenstance," the definition would be "boundless." *Id.* at PageID.1102, 1108.

But Congress's broad definition is not boundless. Last Term, the Supreme Court explained that the similar "phrase 'relating to'" would be boundless if read "in a literalist sense," because "everything is related to everything else." *Plaquemines*, 146 S. Ct. at 1060-61 (cleaned up). "But, generally in statutory interpretation, 'it is the ordinary, not literalist, meaning that is the better one.'" *Id.* at 1061. And "[t]he ordinary understanding of 'relating to' requires a connection that is not 'tenuous, remote, or peripheral,'" *id.* at 1061. That same approach applies with equal force to "associated with," which covers the same ground as

"relating to." *See supra* p.42. The term has an ascertainable ordinary meaning; that meaning controls.

Granted, that meaning is broad—intentionally so, given Congress's goal of ensuring effective regulation of swaps after the financial crisis. Yet the district court concluded that the definition's breadth made it "ambiguous," requiring judicial "limitation." Opinion, R.41, PageID.1100, 1103. But it is a mistake to "confuse[] ambiguity with breadth." *United States v. Damrah*, 412 F.3d 618, 627 (6th Cir. 2005); *see Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 (9th Cir. 2016) ("[A] word or phrase is not ambiguous just because it has a broad general meaning."). And because "associated with" is not ambiguous—much less "inescapably" so—the court erred in turning to extratextual sources. *Garcia v. United States*, 469 U.S. 70, 76 n.3 (1984).

*Second*, the district court improperly invoked the surplusage canon—and ended up making paragraph (A)(ii) entirely superfluous. *See* Opinion, R.41, PageID.1102. That canon does not apply because the overlap among the various definitions of "swap" is intentional and unavoidable.

In Dodd-Frank, Congress sought "to avoid potential ambiguities, gaps, or loopholes" by adopting a "belt and suspenders" approach to the definition of swap. *Snyder v. United States*, 603 U.S. 1, 19 (2024). It built redundancies into the scheme. *See Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Sometimes the better overall reading of the statute contains some redundancy.").

Consider an interest-rate cap, a derivative where payments are made if interest rates exceed a pre-agreed level. "[R]ate cap[s]" are expressly covered by paragraph (A)(iii). 7 U.S.C. § 1a(47)(A)(iii)(III). They are covered by paragraph (A)(i) as "cap[s] . . . based on the value[] of 1 or more interest . . . rates." *Id.* § 1a(47)(A)(i). And they are covered by paragraph (A)(iv) as "commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv); *cf. Thrifty Oil*, 322 F.3d at 1042 (an "interest rate swap" is "the simplest and most common type of swap contract").

Because no "competing interpretation" of the definition can prevent overlap between each "clause and word," the presumption against redundancy supplies no "assist[ance]." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *see*, *e.g.*, *Polselli v. U.S. Dep't of Treasury*, 23 F.4th 616, 626 (6th Cir. 2022) ("no[] superfluity" where Congress "include[d] for

clarity two subsections in statutory definition covering the same conduct"). The court had no "license to add limiting language to the statute." *Polselli*, 23 F.4th at 626.

It is the court's limiting language that would render paragraph (A)(ii) superfluous. As the court acknowledged, inserting an "inherently joined or connected with" requirement would render that paragraph "irrelevant": All the contracts that (in its view) should be covered by paragraph (A)(ii) "would qualify as a swap under" another provision. Opinion, R.41, PageID.1112-13. The court's own examples of contracts "Congress would have understood" to be swaps—those "based on interest rates, exchange rates, or prices with payments calculated by reference to a principal base"—are already and explicitly covered by paragraph (A)(i). *Id.* at PageID.1112.

*Third*, the court erred by invoking *noscitur a sociis*—purporting to draw its inherent-connection requirement from the other definitions of "swap." Opinion, R.41, PageID.1112. Accepting the State's argument, the court concluded that because "every other part of the 'swap' definition concerns financial instruments used to hedge economic risk," paragraph

(A)(ii) should cover only "financial instruments based on economic events that are used for hedging risk." Opposition, R.21, PageID.262-64.

Again, that argument finds no textual support. Of the six other definitions, only *one* (paragraph (A)(iii)) requires that the contract be used for "transfer[]" of "financial risk." Nothing else in the CEA requires hedging. To the contrary, Congress in 2000 *eliminated* the requirement that a listed derivatives contract have "more than occasional use . . . for hedging." 40 Fed. Reg. 25849, 25850 (1975); *see KalshiEX*, 2024 WL 4164694, at *2 (discussing this revision). And the *noscitur* canon has no role to play because there is no "general phrase" in need of clarification. *Fischer v. United States*, 603 U.S. 480, 488 (2024).

Even if the canon applied, it would not warrant an inherent economic connection requirement. In the court's view, some "specifically enumerated" swaps, such as "weather swaps," do *not* have "an inherent connection to a potential economic consequence." Opinion, R.41, PageID.1113; *see* 7 U.S.C. § 1a(47)(A)(iii)(XVII). Because an inherent economic consequence is not a "common attribute" among the definitions, it may not be imputed onto paragraph (A)(ii). *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).

*Fourth*, applying "the presumption against intruding into traditional areas of state authority," the district court looked for a "clear statement that Congress intended to sweep in activity that had long been a core state responsibility." Opinion, R.41, PageID.1100, 1114. In other words, the court applied "the presumption against preemption." *Churchill Downs*, 162 F.4th at 641 n.5.

But that presumption does not apply here. It does not apply in "express pre-emption" cases. *Franklin*, 579 U.S. at 125. It does not apply where "there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000), and "the federal government has regulated the derivatives market for over a century," *Flaherty*, 172 F.4th at 230; *see Curran*, 622 F.2d at 235 ("the regulation of commodity futures trading is essentially a matter of federal concern"). And it does not apply because, even on the State's framing, "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Churchill Downs*, 162 F.4th at 641 n.5.

Even if the presumption applied, it was "overcome." *Churchill Downs*, 162 F.4th at 641 n.5. By following the *Santa Fe* roadmap in 1974, *supra* p.27, Congress "act[ed] so unequivocally as to make clear that it

intend[ed] no regulation except its own" as to the derivatives listed in CEA section 2. *Santa Fe*, 331 U.S. at 236. And in Dodd-Frank, Congress added "swaps" to that list. Congress therefore "made clear its desire for pre-emption" as to all contract-market-traded derivatives. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001).

*Finally*, the district court looked for a specific reference to "state gaming or gambling laws" in the CEA. Opinion, R.41, PageID.1105. But it identified no authority for an extra-clear statement rule where state gambling laws are concerned—because there is none.

Regardless, the CEA satisfies even that more demanding rule. The Special Rule permits—but does not require—*the CFTC* to ban the listing of "swaps" where the underlying event involves "gaming," if *the CFTC* believes such "transactions are contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C); *see supra* p.15. The district court called the Special Rule an "oblique" indicator "of congressional intent." Opinion, R.41, PageID.1114. But its plain text confirms that Congress granted the CFTC jurisdiction over swaps trading that might touch on state gambling law—and that jurisdiction is exclusive. Moreover, Congress did so precisely because members were aware that "[i]t would be quite easy to

construct an 'event contract' around sporting events." 156 Cong. Rec. S5902, S5906 (daily ed. July 15, 2010).

**d.** The district court next turned to statutory purpose. *See* Opinion, R.41, PageID.1106 ("[T]he primary issue [Congress] set out to solve" was the "systemic risk[] to the economy" posed by "large financial institutions"). But courts may not "replace the actual text with speculation as to Congress' intent." *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). Particularly where, as here, the "finding of textual ambiguity [was] wrong," "reference to legislative history [was] inappropriate." *Rucker*, 535 U.S. 125 at 132-33. Besides, the legislative history *does* indicate that Congress had sports-related contracts "in mind when it defined 'swap.'" *Contra* Opinion, R.41, PageID.1106; *see supra* p.15.

Regardless, when Congress employs "self-consciously expansive language," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985)—such as "any agreement," "associated with," and "potential," 7 U.S.C. § 1a(47)(A)—it is not unusual for the law to end up being "applied in situations not expressly anticipated by Congress," *Sedima*, 473 U.S. at 499 (cleaned up). "Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress." *Id*. "Even

if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018).

* * *

In defining swap, Congress "drafted a particularly broad definition"; it is not the court's "function to undermine that effort," whether by invoking purpose, context, legislative history, or inapplicable presumptions. *Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*, 307 F.3d 1220, 1223 (9th Cir. 2002). This Court should reverse.

### B. Field Preemption Bars Michigan From Regulating Transactions On A CFTC-Designated Contract Market.

"Field preemption occurs where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (cleaned up). The inquiry considers "the scope of [the] federal statute," *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012), as well as its "structure and purpose," *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

"A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field." *Churchill Downs*, 162 F.4th at 638. Here, scope, structure, and purpose all point one way: Congress intended to regulate the narrow field of trading on CFTC-designated contract markets.

**1.** The scope of the CEA's regulation of contract-market-traded derivatives is extensive. This Court has long recognized that the CEA sets out a "comprehensive regulatory scheme," "grant[ing] the CFTC plenary power over . . . contract markets." *Curran*, 622 F.2d at 231-32. The CEA details (1) stringent requirements to become and remain a designated contract market, 7 U.S.C. §§ 7(d), 8(a); (2) the process for listing and approving contracts, *id.* § 7a-2(c); (3) the kinds of contracts that may be listed, *id.* § 7a-2(c)(5); and (4) the enforcement mechanisms for contract-market or trader misconduct, *e.g.*, *id.* §§ 7b, 8(b), 9, 13a, 13b. Should the CFTC identify a gap, it may engage in additional rulemaking. *Id.* § 12a(5).

All told, "[t]he federal statutory directives provide a full set of standards"—"a 'single integrated and all-embracing system'"—governing

contract-market trading. *Arizona v. United States*, 567 U.S. 387, 401 (2012) (such standards indicate field preemption).

The statutory structure confirms that Congress "ma[de] a single sovereign responsible for" regulating contract-market transactions. *Arizona*, 567 U.S. at 401. The CFTC has "exclusive jurisdiction" "with respect to" contract-market-traded "future[s]," "option[s]" on futures, and "swaps"—that is, over all "agreements" that may be "traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). It is responsible for "further defin[ing] the term[] swap." 15 U.S.C. §§ 8302(d)(1), 8321(b). And it is up to the CFTC, not the States, to determine whether an event contract involves "gaming," is "contrary to the public interest," and should be prohibited. 7 U.S.C. § 7a-2(c)(5)(C).

The States, by contrast, may enforce the CEA against "any person"—but not against "a contract market," 7 U.S.C. § 13a-2(1), an indication that Congress was concerned with "detracting from the integrated scheme of regulation," *Arizona*, 567 U.S. at 402 (cleaned up). State authority against contract markets is limited to enforcing the "antifraud provisions" of the CEA and CFTC regulations—and then only after "prior written notice" to the CFTC. 7 U.S.C. § 13a-2(8)(A), (B). And

the CEA preserves the application of state law only as to commodities transactions "*not* conducted on or subject to the rules" of contract markets. *Id.* § 16(e)(1)(B)(i) (emphasis added).

Statutory purpose beats the same drum. The post-1974 CEA keeps regulation of "market participants" "under the oversight of the Commission," 7 U.S.C. § 5(b), "to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12.

Every indicator of congressional intent shows that Congress "intend[ed] federal law to 'occupy the field'" of trading on designated contract markets. *Crosby*, 530 U.S. at 372. The State "may not enter" that field "in any respect," *Arizona*, 567 U.S. at 402, or use its gaming laws to regulate Polymarket US's contract market "direct[ly]" or "indirectly," *N. Nat. Gas Co.*, 372 U.S. at 91.

**2.** The district court erred in declining to find field preemption.

*First*, the court's observation that the CEA "specifically provides for state regulators' ability to enforce the [Act]," Opinion, R.41, PageID.1123, is incorrect as against "a contract market," 7 U.S.C. § 13a-2(1). And a "savings clause concern[ing] a different field"—such as the clause addressing trading not conducted on a contract market—"is inapposite to

the question whether Congress intended to preempt the field" "at issue here." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 619-20 (6th Cir. 2008).

*Second*, the CEA provides that States may enforce generally applicable state fraud laws "in state courts" and "without the CFTC's involvement," Opinion, R.41, PageID.1123—exempting such laws from the requirements that apply when States enforce the CEA, *see* 7 U.S.C. § 13a-2(7)—but it says nothing about whether States could bring such suits against contract markets. And the provision itself indicates that other state-law claims (like those Michigan threatens) are unavailable, *de la Cuesta*, 458 U.S. at 163, *not* that "supplementary state legislation" is generally permissible, *contra* Opinion, R.41, PageID.1123.

In any event, the existence of a savings clause does not put field preemption off the table. *See Churchill Downs*, 162 F.4th at 638 (Natural Gas Act is field-preemptive even though it "preserves state-law antitrust claims"). Nor does section 2's "general saving clause"—which applies only to "'*this section*'"—"purport to preclude pre-emption of state law by other provisions." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987)*; see Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) ("[T]his Court has repeatedly declined to give broad effect to saving clauses where doing

so would upset the careful regulatory scheme established by federal law." (cleaned up)).

*Finally*, the court's statement that "state contract law is foundational to the entire enterprise of contract markets" is questionable. Opinion, R.41, PageID.1123. When a "contract [is] entered into pursuant to authority conferred by federal statute," "federal law controls." *United States v. Seckinger*, 397 U.S. 203, 209 (1970); *cf. Great Plains Coop. v. CFTC*, 205 F.3d 353, 354 (8th Cir. 2000) (the CEA "gives *the CFTC* the authority to regulate, among other things, the formation and sale of 'futures contracts'" (emphasis added)). The definition of "swap" includes not just "contract[s]" but also "agreement[s]" and "transaction[s]," 7 U.S.C. § 1a(47)(A), suggesting that the existence of a contract under state law is not dispositive. And the CFTC has explained that, to the extent it relies on "state law" "when determining whether a particular product is a swap," it does so only for convenience, retaining "authority to diverge from state law." 77 Fed. Reg. at 48219 & n.104.

Regardless, Congress did not set out to preempt the field of contract law; the federally reserved field of contract-market trading is much "more modest," but it "prevails" over state law all the same. *Santa Fe*, 331 U.S.

at 236. Polymarket US is aware of no precedent suggesting that field preemption is foreclosed just because an otherwise-comprehensive federal scheme "relies on the existence of" "state contract law." Opinion, R.41, PageID.1123; *cf. Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 301-04, 306 (1988) (field preemption prevented State from regulating natural gas companies' issuance of securities). And because the federal government is one of limited powers, Congress *always* legislates "against the background of the total corpus juris of the state[s]." *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966) (cleaned up). If background principles of state law defeated field preemption, there would be no field preemption.

### C. Conflict Preemption Also Bars Michigan's Attempt To Regulate Designated Contract Markets.

There are two kinds of conflict preemption. Obstacle preemption arises when state law is "an obstacle to the accomplishment of the full purposes and objectives of Congress." *Counts v. Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025) (cleaned up). Impossibility preemption arises when "compliance with both" federal and state law "is impossible." *Churchill Downs*, 162 F.4th at 638. "Whether a state-law claim presents

such an 'obstacle' depends on the federal statute's text, not on a judge's sense of what the statute's purposes might be." *Counts*, 139 F.4th at 581 (cleaned up). Both kinds of conflict preemption foreclose a Michigan enforcement action.

### 1. Michigan's Laws Pose An Obstacle To The Accomplishment Of Congress's Objectives.

Michigan's efforts to regulate Polymarket US's designated contract market stand as an obstacle to both (1) the self-certification regime Congress enacted in the CEA and (2) Congress's objective of uniform regulation of event contracts.

**a.** Start with self-certification. *Bibbo v. Dean Witter Reynolds, Inc.*—where this Court held another state law conflict-preempted by the CEA—is instructive. There, an Ohio plaintiff sued a futures commission merchant or "FCM" (a CEA-regulated entity) for retaining interest on collateral the plaintiff had paid and the FCM had invested in accordance with CFTC regulations. 151 F.3d at 564. The plaintiff claimed that Ohio law required "any interest or profits received from the investments serving as collateral [to] be paid to" him, "unless otherwise agreed by the parties." *Id.* at 562. The FCM argued that Ohio law was conflict-

preempted by a CFTC regulation providing that "[t]he investment of customer funds . . . shall not prevent the" FCM "from receiving and retaining as its own any increment or interest resulting therefrom." *Id.* (quoting 17 C.F.R. § 1.29(a)).

This Court agreed with the FCM. The regulation "simply *permits*, but does not *compel*" FCMs "to retain interest earned," *Bibbo*, 151 F.3d at 563-64, yet a "conflict does not evaporate" so easily, *id.* at 563. The CFTC had given FCMs "the flexibility . . . to decide whether to allow [their] customers to retain the interest earned from the investment." *Id.* at 564. By "grant[ing] [plaintiff] the option to veto" that decision, Ohio law "deprive[d] FCMs of a valuable benefit granted them" under federal law. *Id.* Plaintiff's claim therefore "st[ood] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 563. So, "[a]lthough compliance with both the federal regulation and state law [was] not . . . a physical impossibility," state law still "fail[ed] the obstacle test." *Id.* at 563-64 (cleaned up).

So too for the self-certification regime. For the last quarter century, Congress has afforded contract markets an alternative to seeking pre-approval: A contract market "may elect to list for trading or accept for

clearing any new contract . . . by providing to the Commission . . . a written certification that the new contract . . . complies with" the CEA and "regulations under" it. 7 U.S.C. § 7a-2(c)(1). Congress thus granted contract markets a "valuable benefit": "the flexibility" to list a contract through certification, subject only to after-the-fact CFTC review. *Bibbo*, 151 F.3d at 564. By asserting control over the listing process, Michigan claims for itself (and every other State) "the option to veto" that decision—replacing after-the-fact review by one regulator with prior approval by fifty. *Id*. By "imped[ing] the flexibility [Congress] provided" to contract markets like Polymarket US, Michigan "fails the obstacle test." *Id.*

This isn't the first time Michigan has wielded its gaming laws this way. In *Churchill Downs*, Michigan attempted to interfere with the process for accepting interstate horseracing wagers. Federal law requires wagering platforms to obtain consent from their home State and from a "racetrack's home state"; Michigan law made a third State's consent necessary—Michigan's. 162 F.4th at 634. This Court held the law preempted: By "tell[ing] regulated parties that [Congress'] two-state

[consent] scheme isn't enough," Michigan unconstitutionally "interfere[d] with [Congress'] *methods* to reach the objectives." *Id.* at 638. So too here.

**b.** Michigan's efforts to regulate Polymarket US also interfere with another CEA objective: bringing contract markets "under a uniform set of regulations." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001); *see also Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) ("[A] contract market could not operate efficiently, and perhaps not at all, if" states imposed "varying and potentially contradictory legal" duties). "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12, by placing "trading facilities . . . under the oversight of the Commission," 7 U.S.C. § 5(b). But if Michigan may regulate contract-market trading, so may every other State. The result will be "different substantive standards applicable to the same . . . conduct, requiring the tailoring of" contract trading "to the peculiarities of the law of each jurisdiction"—an outcome "fundamentally at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).

**c.** The district court erred in rejecting conflict preemption. For example, the court quoted, but did not apply, *Bibbo*'s "valuable benefit" test. Opinion, R.41, PageID.1125. It instead looked for "authority establishing a 'right' to trade post-self-certification without any potential restriction or consequence." *Id.* at PageID.1127. But the CEA authorizes Polymarket US to list contracts for trading after self-certification, while Michigan claims authority to prohibit that trading. *See* 7 U.S.C. § 7a-2(c)(1).

The court also found no conflict with the self-certification regime because Polymarket US remains "subject to state fraud laws," Opinion, R.41, PageID.1127 (citing 7 U.S.C. § 13a-2(7)), and because event "contracts could be found unenforceable under state law" rules about "adequate consideration," *id.* But the CEA provides that states may enforce fraud laws based on the *CEA or CFTC regulations*—not state law—against contract markets. *Supra* p.58. And whether a contract is supported by adequate consideration is entirely separate from whether it is a swap and otherwise complies with the CEA—questions Congress tasked the CFTC with answering. Regardless, "[c]onflict preemption may" arise even when "Congress has not entirely displaced state

regulation over the matter in question." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Practices Litig.*, 65 F.4th 851, 859-60 (6th Cir. 2023) (cleaned up).

As for uniformity, the district court acknowledged that "one of the goals of the CEA may have been to 'avoid a diversity of regulations between the [CFTC] and the states.'" Opinion, R.41, PageID.1125-26 (quoting *Kelly*, 691 F.2d at 804 n.12). But it then applied the presumption against preemption because the State is "regulating gambling activity," *id.* at PageID.1125, despite this Court's rejection of that argument in *Churchill Downs*. *See supra* p.51.

The court also stated it would "not find implied preemption merely where that would advance *a* congressional purpose, but only where preempting state law was *the* purpose to be advanced." Opinion, R.41, PageID.1126. But because "most laws" "serve" multiple "objective[s]," *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 108 (2003), the question is whether the state regulation "stands as an obstacle to the accomplishment and execution of the *full purposes and objectives*"—plural—"of Congress," *Bibbo*, 151 F.3d at 563 (emphases added).

In the alternative, the court reasoned that implied preemption is available only "where clear purposes could not be achieved any other way." Opinion, R.41, PageID.1125. But it did not explain how uniformity of regulation could be achieved if every State or municipality may impose its own rules.

Finally, the narrow carve-out for "general antifraud laws," Opinion, R.41, PageID.1126, is not an invitation for States to apply *all* their laws, *see supra* p.56. Section 2's "savings clauses," Opinion, R.41, PageID.1126, supply no such invitation either, *see supra* p.20. And the possibility that *the CFTC* might ban "contracts involving 'activity that is unlawful under . . . State law,'" demonstrates that any "market[] segment[ation]," Opinion, R.41, PageID.1126 (first emphasis added) (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)(I)), may be effected by *the CFTC*, not by state regulators, *see supra* p.15. At bottom, none of these rationales addresses the problem this case presents: the unavoidable conflict between uniform regulation of national derivatives markets and the application of 50 States' gaming regulations to those markets.

### 2. Michigan's Gaming Laws Are Also Subject To Impossibility Preemption.

Polymarket US is subject to two irreconcilable conflicting sets of regulatory demands. Federal law requires each contract market to "provide its members . . . with impartial access to its markets and services" "in a non-discriminatory manner." 17 C.F.R. § 38.151(b). According to the CFTC, a contract market violates this "impartial-access requirement" if it limits members' access based on "geograph[y]"—including based on compliance with "state gambling laws." Amicus Br. of CFTC at 24, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31. Michigan requires Polymarket US to do just that. It demands that Polymarket US (1) prohibit trading by Michigan members aged between 18 and 21, and (2) "limit[]" "transactions" to those between "an authorized participant located in [Michigan]" and other residents of Michigan or additional States of the Michigan gaming regulator's choosing. Mich. Comp. Laws § 432.411(1). Under this statute, Polymarket US must wall Michigan members into a segregated pool, in which they could transact only with one another—or with residents of

whichever States the Michigan Gaming Control Board later chose to favor by agreement. Polymarket US cannot satisfy both sets of demands.

The district court did not address the CFTC's position head-on. Based on the background section of a proposed rule, it reasoned that the impartial-access requirement simply prevents contract markets from using "discriminatory access requirements as a competitive tool against certain participants." Opinion, R.41, PageID.1124 (quoting 75 Fed. Reg. 80572, 80579 (2010)). But it is the text of the final rule that controls, and the court did not explain how limits based on geographic location would be "non-discriminatory." 17 C.F.R. § 38.151(b).

The district court apparently agreed with the *Flaherty* dissent's suggestion that a contract market might comply with State gambling law by creating a "separate market for [State] residents." 172 F.4th at 239 (Roth, J., dissenting); *see* Opinion, R.41, PageID.1125 ("Strategies exist to comply with both state-law geographic restrictions and the federal regulations."). But "the impossibility analysis" "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to" stop selling its current products and switch to new ones. *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488, 490 (2013). The

theoretical possibility of switching from an interstate derivatives market to a state-regulated *intra*state business is therefore "irrelevant to [the] analysis." *Id.* at 490.

## II. The Irreparable Harm And Public Interest Factors Strongly Support A Preliminary Injunction.

### A. Polymarket US Will Suffer Irreparable Harm Absent An Injunction.

Without a preliminary injunction, Polymarket US is put to "a Hobson's choice: continually violate [Michigan] law and expose [itself] to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). In these circumstances, "the prospect of [state] suit . . . supplies the necessary irreparable injury." *Id.* at 382.

But that is not all. "[R]eputation[al]" injury and "loss of customer goodwill" are forms of irreparable harm. *Churchill Downs*, 162 F.4th at 643. Polymarket US offered unrebutted evidence that Michigan's "accusations of illegal gambling activity" are likely to cause such harm. *Id.* (cleaned up); *see* PI Motion, R.14, PageID.87. Similarly unrebutted was the evidence that Polymarket US would suffer irrecoverable losses

"if forced to shut down" in Michigan while this case is pending. *Churchill Downs*, 162 F.4th at 643; *see* PI Motion, R.14, PageID.87-88. Under this Court's precedents, "[t]hat suffices" to establish "irreparable injury." *Churchill Downs*, 162 F.4th at 643.

The district court conflated irreparable harm with the merits, reasoning that there would be no "harm" if Michigan's laws may be constitutionally applied against Polymarket US. Opinion, R.41, PageID.1128 (emphasis omitted). They may not. And this Court has previously warned against issuing "finding[s] on the likelihood of irreparable harm" that are "bound up in the likelihood-of-success-on-the-merits inquiry." *Mich. Educ. Ass'n Family Retired Staff Ass'n v. Mich. Educ. Ass'n*, 856 F. App'x 580, 586 (6th Cir. 2021).

### B. The Public Interest And Balance Of The Equities Strongly Favor An Injunction.

The remaining factors favor Polymarket US. "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). That is especially true where the "policies underlying" the CEA may not "be interfered with by the application of the fifty states'

different . . . laws." *Id*. The public's interest "lies in the correct application of the law." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

Here, too, the district court's analysis rose and fell with the merits. The court recognized that "there is no legitimate interest in applying the law unconstitutionally," but reasoned that "the chance that [the State] would do so is directly proportional to the strength of [Polymarket US's] merits arguments." Opinion, R.41, PageID.1129. Because the merits are with Polymarket US, so are the equities.

## CONCLUSION

The Court should reverse the order of the district court denying the preliminary-injunction motion.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Thomas H. Dupree Jr.*

Orin Snyder
Matt Benjamin
200 Park Avenue
GIBSON, DUNN & CRUTCHER LLP
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, DC 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

Patrick G. Seyferth
Derek J. Linkous
BUSH SEYFERTH PLLC
100 West Big Beaver, Suite 400
Troy, MI 48084
Telephone: 248.822.7800
seyferth@bsplaw.com
linkous@bsplaw.com

*Attorneys for Appellant QCX LLC d/b/a Polymarket US*

## CERTIFICATE OF COMPLIANCE

Pursuant to 6th Cir. R. 32(a) and Fed. R. App. P. 32(g)(1), I certify that as required by Fed. R. App. P. 32(a)(7)(B)(i) the attached brief contains 12,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point New Century Schoolbook typeface using Microsoft Word 2025.

Dated: August 17, 2026

*<u>/s/ Thomas H. Dupree Jr.</u>*
Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2026, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated: August 17, 2026

*/s/ Thomas H. Dupree Jr.*
Thomas H. Dupree Jr.

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

**Page**

Federal Statutes ........ 77

7 U.S.C. § 1a. Definitions ........ 77

(19) Excluded commodity ........ 77

(47)(A) Swap ........ 78

7 U.S.C. § 2. Jurisdiction of Commission; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce ........ 80

(a)(1)(A) In General ........ 80

7 U.S.C. § 5. Findings and purpose ........ 81

(a) Findings ........ 81

(b) Purpose ........ 81

7 U.S.C. § 7. Designation of boards of trade as contract markets ........ 82

(d) Core principles for contract markets ........ 82

7 U.S.C. § 7a-2. Common provisions applicable to registered entities ........ 89

(c) New contracts, new rules, and rule amendments ........ 89

7 U.S.C. § 13a-2. Jurisdiction of the States ........ 94

7 U.S.C. § 16. Commission operations ........ 97

(e) Relation to other law, departments, or agencies ........ 97

15 U.S.C. § 8302. Review of regulatory authority ........ 99

(d)(1) Joint rulemaking; In general ........ 99

15 U.S.C. § 8321. Authority to define terms .................................. 99

(b) Modification of definitions .............................................. 99

17 C.F.R. § 38.151. Access Requirements .................................. 100

(b) Impartial access by members, persons with trading privileges and independent software vendors. .......... 100

Michigan Statutes .......................................................................... 101

Mich. Comp. Laws § 432.411. Sports betting operator; duties; age verification requirements; unauthorized use and fraud. prevention ............................................................ 101

Mich. Comp. Laws § 750.301. Accepting money or valuable thing contingent on uncertain event. ................................ 101

## FEDERAL STATUTES

**7 U.S.C. § 1a. Definitions**

As used in this chapter:

**(19) Excluded commodity**

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

**(47)(A) Swap**

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction–

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as-

(I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;
(X) an equity index swap;
(XI) an equity swap;
(XII) a debt index swap;
(XIII) a debt swap;
(XIV) a credit spread;
(XV) a credit default swap;
(XVI) a credit swap;
(XVII) a weather swap;
(XVIII) an energy swap;
(XIX) a metal swap;
(XX) an agricultural swap;
(XXI) an emissions swap; and
(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

**7 U.S.C. § 2. Jurisdiction of Commission; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce**

**(a)(1)(A) In General**

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b–3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

**7 U.S.C. § 5. Findings and purpose**

**(a) Findings**

The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

**(b) Purpose**

It is the purpose of this chapter to serve the public interests described in subsection (a) through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

## 7 U.S.C. § 7. Designation of boards of trade as contract markets

### (d) Core principles for contract markets

**(1) Designation as contract market**

(A) In general

To be designated, and maintain a designation, as a contract market, a board of trade shall comply with—

(i) any core principle described in this subsection; and

(ii) any requirement that the Commission may impose by rule or regulation pursuant to section 12a(5) of this title.

(B) Reasonable discretion of contract market

Unless otherwise determined by the Commission by rule or regulation, a board of trade described in subparagraph (A) shall have reasonable discretion in establishing the manner in which the board of trade complies with the core principles described in this subsection.

**(2) Compliance with rules**

(A) In general

The board of trade shall establish, monitor, and enforce compliance with the rules of the contract market, including—

(i) access requirements;

(ii) the terms and conditions of any contracts to be traded on the contract market; and

(iii) rules prohibiting abusive trade practices on the contract market.

(B) Capacity of contract market

The board of trade shall have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market.

(C) Requirement of rules

The rules of the contract market shall provide the board of trade with the ability and authority to obtain any necessary information to perform any function described

in this subsection, including the capacity to carry out such international information-sharing agreements as the Commission may require.

**(3) Contracts not readily subject to manipulation**
The board of trade shall list on the contract market only contracts that are not readily susceptible to manipulation.

**(4) Prevention of market disruption**
The board of trade shall have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—

(A) methods for conducting real-time monitoring of trading; and

(B) comprehensive and accurate trade reconstructions.

**(5) Position limitations or accountability**

(A) In general

To reduce the potential threat of market manipulation or congestion (especially during trading in the delivery month), the board of trade shall adopt for each contract of the board of trade, as is necessary and appropriate, position limitations or position accountability for speculators.

(B) Maximum allowable position limitation

For any contract that is subject to a position limitation established by the Commission pursuant to section 6a(a) of this title, the board of trade shall set the position limitation of the board of trade at a level not higher than the position limitation established by the Commission.

**(6) Emergency authority**
The board of trade, in consultation or cooperation with the Commission, shall adopt rules to provide for the exercise of emergency authority, as is necessary and appropriate, including the authority—

(A) to liquidate or transfer open positions in any contract;
(B) to suspend or curtail trading in any contract; and
(C) to require market participants in any contract to meet special margin requirements.

**(7) Availability of general information**
The board of trade shall make available to market authorities, market participants, and the public accurate information concerning—
(A) the terms and conditions of the contracts of the contract market; and
(B)(i) the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market; and
(ii) the rules and specifications describing the operation of the contract market's—
(I) electronic matching platform; or
(II) trade execution facility.

**(8) Daily publication of trading information**
The board of trade shall make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts on the contract market.

**(9) Execution of transactions**
(A) In general
The board of trade shall provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market of the board of trade.
(B) Rules
The rules of the board of trade may authorize, for bona fide business purposes—
(i) transfer trades or office trades;
(ii) an exchange of—

(I) futures in connection with a cash commodity transaction;

(II) futures for cash commodities; or

(III) futures for swaps; or

(iii) a futures commission merchant, acting as principal or agent, to enter into or confirm the execution of a contract for the purchase or sale of a commodity for future delivery if the contract is reported, recorded, or cleared in accordance with the rules of the contract market or a derivatives clearing organization.

**(10) Trade information**

The board of trade shall maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—

(A) to assist in the prevention of customer and market abuses; and

(B) to provide evidence of any violations of the rules of the contract market.

**(11) Financial integrity of transactions**

The board of trade shall establish and enforce—

(A) rules and procedures for ensuring the financial integrity of transactions entered into on or through the facilities of the contract market (including the clearance and settlement of the transactions with a derivatives clearing organization); and

(B) rules to ensure—

(i) the financial integrity of any—

(I) futures commission merchant; and

(II) introducing broker; and

(ii) the protection of customer funds.

**(12) Protection of markets and market participants**

The board of trade shall establish and enforce rules—

(A) to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant; and

(B) to promote fair and equitable trading on the contract market.

**(13) Disciplinary procedures**

The board of trade shall establish and enforce disciplinary procedures that authorize the board of trade to discipline, suspend, or expel members or market participants that violate the rules of the board of trade, or similar methods for performing the same functions, including delegation of the functions to third parties.

**(14) Dispute resolution**

The board of trade shall establish and enforce rules regarding, and provide facilities for alternative dispute resolution as appropriate for, market participants and any market intermediaries.

**(15) Governance fitness standards**

The board of trade shall establish and enforce appropriate fitness standards for directors, members of any disciplinary committee, members of the contract market, and any other person with direct access to the facility (including any party affiliated with any person described in this paragraph).

**(16) Conflicts of interest**

The board of trade shall establish and enforce rules—

(A) to minimize conflicts of interest in the decision-making process of the contract market; and

(B) to establish a process for resolving conflicts of interest described in subparagraph (A).

**(17) Composition of governing boards of contract markets**

The governance arrangements of the board of trade shall be designed to permit consideration of the views of market participants.

**(18) Recordkeeping**
The board of trade shall maintain records of all activities relating to the business of the contract market—

(A) in a form and manner that is acceptable to the Commission; and
(B) for a period of at least 5 years.

**(19) Antitrust considerations**
Unless necessary or appropriate to achieve the purposes of this chapter, the board of trade shall not—

(A) adopt any rule or taking* any action that results in any unreasonable restraint of trade; or
(B) impose any material anticompetitive burden on trading on the contract market.

** So in original. Probably should be "take."*

**(20) System safeguards**
The board of trade shall—

(A) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk, through the development of appropriate controls and procedures, and the development of automated systems, that are reliable, secure, and have adequate scalable capacity;
(B) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allow for the timely recovery and resumption of operations and the fulfillment of the responsibilities and obligations of the board of trade; and
(C) periodically conduct tests to verify that backup resources are sufficient to ensure continued order processing and trade matching, price reporting, market

surveillance, and maintenance of a comprehensive and accurate audit trail.

**(21) Financial resources**

(A) In general

The board of trade shall have adequate financial, operational, and managerial resources to discharge each responsibility of the board of trade.

(B) Determination of adequacy

The financial resources of the board of trade shall be considered to be adequate if the value of the financial resources exceeds the total amount that would enable the contract market to cover the operating costs of the contract market for a 1-year period, as calculated on a rolling basis.

**(22) Diversity of board of directors**

The board of trade, if a publicly traded company, shall endeavor to recruit individuals to serve on the board of directors and the other decision-making bodies (as determined by the Commission) of the board of trade from among, and to have the composition of the bodies reflect, a broad and culturally diverse pool of qualified candidates.

**(23) Securities and Exchange Commission**

The board of trade shall keep any such records relating to swaps defined in section 1a(47)(A)(v) of this title open to inspection and examination by the Securities and Exchange Commission.

## 7 U.S.C. § 7a-2. Common provisions applicable to registered entities

### (c) New contracts, new rules, and rule amendments

**(1) In general**
A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

**(2) Rule review**
The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

**(3) Stay of certification for rules**
(A) A notification by the Commission pursuant to paragraph (2) shall stay the certification of the new rule

or rule amendment for up to an additional 90 days from the date of the notification.

(B) A rule or rule amendment subject to a stay pursuant to subparagraph (A) shall become effective, pursuant to the certification of the registered entity, at the expiration of the period described in subparagraph (A) unless the Commission—

(i) withdraws the stay prior to that time; or

(ii) notifies the registered entity during such period that it objects to the proposed certification on the grounds that it is inconsistent with this chapter (including regulations under this chapter).

(C) The Commission shall provide a not less than 30-day public comment period, within the 90-day period in which the stay is in effect as described in subparagraph (A), whenever the Commission reviews a rule or rule amendment pursuant to a notification by the Commission under this paragraph.

**(4) Prior approval**

(A) In general

A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

(B) Prior approval required

Notwithstanding any other provision of this section, a designated contract market shall submit to the Commission for prior approval each rule amendment that materially changes the terms and conditions, as determined by the Commission, in any contract of sale for future delivery of a commodity specifically enumerated in section 1a(10)* of this title (or any option thereon) traded through its facilities if the rule amendment applies to contracts and delivery months which have already been listed for trading and have open interest.

(C) Deadline

If prior approval is requested under subparagraph (A), the Commission shall take final action on the request not later than 90 days after submission of the request, unless the person submitting the request agrees to an extension of the time limitation established under this subparagraph.

** So in original.*

**(5) Approval**

(A) Rules

The Commission shall approve a new rule, or rule amendment, of a registered entity unless the Commission finds that the new rule, or rule amendment, is inconsistent with this chapter (including regulations).

(B) Contracts and instruments

The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)* of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

**So in original.*

**7 U.S.C. § 13a-2. Jurisdiction of the States**

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon

doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the

Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

## 7 U.S.C. § 16. Commission operations

### (e) Relation to other law, departments, or agencies

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e)* of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

** See References in Text.*

**15 U.S.C. § 8302. Review of regulatory authority**

**(d)(1) Joint rulemaking; In general**

Notwithstanding any other provision of this title* and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 78c(a)(78) of this title.

* *See References in Text*.

**15 U.S.C. § 8321. Authority to define terms**

**(b) Modification of definitions**

To include transactions and entities that have been structured to evade this subtitle (or an amendment made by this subtitle), the Commodity Futures Trading Commission shall adopt a rule to further define the terms "swap", "swap dealer", "major swap participant", and "eligible contract participant".

**17 C.F.R. § 38.151. Access Requirements**

**(b) Impartial access by members, persons with trading privileges and independent software vendors.**

A designated contract market must provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services, including:

(1) Access criteria that are impartial, transparent, and applied in a non-discriminatory manner; and

(2) Comparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the designated contract market.

## MICHIGAN STATUTES

**Mich. Comp. Laws § 432.411. Sports betting operator; duties; age verification requirements; unauthorized use and fraud. prevention**

(1) A sports betting operator shall provide, or shall require the sports betting supplier providing an internet sports betting platform to provide, 1 or more mechanisms on the internet sports betting platform that are designed to reasonably verify that an authorized participant is 21 years of age or older and that internet sports betting is limited to transactions that are initiated and received or otherwise made by an authorized participant located in this state or, if the board authorizes multijurisdictional internet sports betting as provided in this act, another jurisdiction in the United States authorized by the multijurisdictional agreement.

**Mich. Comp. Laws § 750.301. Accepting money or valuable thing contingent on uncertain event.**

Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain, is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00.

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Per Sixth Circuit Rules 28 and 30(b), Polymarket US hereby designates the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 3/4/2026 | 1 | 1-26 |
| Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 3/6/2026 | 14 | 52-91 |
| Declaration of Andrew Clifford | 3/6/2026 | 14-1 | 92-96 |
| Declaration of Jacob Spencer | 3/6/2026 | 14-2 | 97-99 |
| Exhibit 1 - CFTC Public Remarks | 3/6/2026 | 14-3 | 100-106 |
| Exhibit 2 - CFTC 9th Circuit Amicus Brief | 3/6/2026 | 14-4 | 107-151 |
| Exhibit 3 - Defendant's State Court Complaint Against KalshiEX | 3/6/2026 | 14-5 | 152-174 |
| Exhibit 4 - CFTC Op-Ed | 3/6/2026 | 14-6 | 175-177 |
| Exhibit 5 - CFTC Designation | 3/6/2026 | 14-7 | 178-182 |
| Exhibit 6 - QCX LLC Event Contracts Self-Certification | 3/6/2026 | 14-8 | 183-188 |

| | | | |
|---|---|---|---|
| Exhibit 7 - QCX LLC CPI Contracts Self-Certification | 3/6/2026 | 14-9 | 189-191 |
| Exhibit 8 - CFTC No-Action Letter | 3/6/2026 | 14-10 | 192-198 |
| Exhibit 9 - Michigan Gaming Control Board | 3/6/2026 | 14-11 | 199-203 |
| Exhibit 10 - QCX LLC Athletic Event Contracts Self-Certification | 3/6/2026 | 14-12 | 204-210 |
| Exhibit 11 - PHIL17 News Article | 3/6/2026 | 14-13 | 211-213 |
| Exhibit 12 - Philadelphia Today article | 3/6/2026 | 14-14 | 214-215 |
| Amended Motion for Temporary Restraining Order and Preliminary Injunction | 3/6/2026 | 15 | 218-219 |
| Opinion and Order on Motion for Temporary Restraining Order | 3/10/2026 | 17 | 227-235 |
| Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction | 4/21/2026 | 21 | 243-296 |
| Reply in Support of Motion for Preliminary Injunction | 5/22/2026 | 38 | 1062-1086 |
| Opinion and Order on Motion for | 6/17/2026 | 41 | 1097-1130 |

| | | | |
|---|---|---|---|
| Preliminary Injunction | | | |
| Notice of Appeal | 6/17/2026 | 42 | 1131-1133 |
| Order Granting Stay Pending Sixth Circuit Appeal | 8/5/2026 | 48 | 1170 |