No. 26-1552

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

QCX, LLC, dba Polymarket US,

Plaintiff-Appellant,

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JIM ANANICH, in his official capacity as Board Chair of the Michigan Gaming Control Board; JONI M. THROWER DAVIS, in her official capacity as Member of the Michigan Gaming Control Board; ANDREW T. PALMS, in her official capacity as Member of the Michigan Gaming Control Board; DEIDRE A. LAMBERT-BOUNDS, in her official capacity as Member of the Michigan Gaming Control Board; MARK EVENSON, in his official capacity as Member of the Michigan Gaming Control Board; HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the Michigan Gaming Control Board,

Defendants-Appellees.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Paul L. Maloney

**BRIEF FOR DEFENDANTS-APPELLEES**

Lauren E. Fitzsimons
Felepe H. Hall
Jason A. Geissler
Assistant Attorneys General
Attorneys for Defendants - Appellees
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823

(517) 241-0210
FitzsimonsL@michigan.gov
HallF2@michigan.gov
GeisslerJ@michigan.gov

Dated: September 16, 2026

## CORPORATE DISCLOSURE

State government and state agencies are excepted from filing a corporate affiliate/financial interest disclosure statement.

# TABLE OF CONTENTS

Page


Corporate Disclosure ... i

Table of Contents ... ii

Table of Authorities ... v

Statement in Support of Oral Argument ... xv

Jurisdictional Statement ... 1

Statement of Issues Presented ... 2

Introduction ... 3

Statement of the Case ... 5

A. Federal law defers to state gambling policies ... 5

B. Michigan regulates sports betting under its longstanding police power. ... 7

C. The CEA and state gambling regulations have coexisted for decades. ... 8

D. Polymarket preemptively sued Michigan officials and the District Court denied Polymarket's requested injunction. ... 11

Standard of Review ... 13

Summary of Argument ... 14

Argument ... 16

I. Polymarket is unlikely to succeed on the merits. ... 16

A. Federal preemption turns on the statutory text and three binding clear statement rules govern that textual analysis. ... 17

1. The major questions doctrine applies because sports betting is a politically and historically significant multi-billion dollar industry. ..................... 21

2. The federalism canon applies because if “swaps” included sports betting and preemption applied, all sports betting would be regulated *only* by the CFTC. ........................................................................ 22

3. Polymarket’s view would impliedly repeal other federal laws. ................................................................ 25

B. Sports bets are not “swaps” under the CEA. ........................ 28

1. Courts interpret what authority is delegated by Congress, not the CFTC. ............................................ 30

2. Sports bets are not swaps under the plain statutory text. ........................................................... 33

3. The statutory and regulatory context confirms sports bets are not “swaps.” ........................................ 40

4. A broad interpretation of “swaps” is inconsistent with Dodd-Frank’s purposes and the CFTC’s regulations. ............................................................. 44

C. The CEA does not preempt the States’ authority over sports betting. ................................................................ 47

1. Express preemption does not apply. ............................ 48

a. The CEA contains other provisions that *do* expressly preempt state law. ............................... 53

b. Dodd-Frank added an express preemption provision *only* for specific security-based swaps. ................................................................ 55

c. None of the authorities Polymarket cites say that "exclusive jurisdiction" means preemption. ........ 56

d. The savings clauses do not help Polymarket. .... 58

e. The fact that Polymarket must resort to statutory *history* to make an *express* preemption argument is telling. ........ 60

2. Field preemption does not apply. ........ 61

3. Michigan's sports betting laws do not conflict with the federal law. ........ 66

a. Enforcing Michigan gaming law is not an obstacle to Dodd-Frank's objectives. ........ 66

b. It is not impossible for Polymarket to comply with Michigan law and the CEA. ........ 70

II. The district court did not abuse its discretion in finding that the balance of harms favors Michigan. ........ 71

Conclusion ........ 72

Certificate of Compliance ........ 73

Certificate of Service ........ 74

Designation of Relevant District Court Documents ........ 75

## TABLE OF AUTHORITIES

Page

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) .......... 5, 22

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 19, 20, 22

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .......... 24, 48

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .......... 64

*Am. Apparel & Footwear Assoc. v. Baden*,
107 F.4th 934 (9th Cir. 2024) .......... 49

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 65

*Bibbo v. Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) .......... 68

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 21

*Bloomberg L.P. v. CFTC*,
949 F. Supp. 2d 91 (D.D.C. 2013) .......... 10

*Bond v. United States*,
572 U.S. 844 (2014) .......... 18, 19, 23, 24

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) .......... 47

*Carter v. Carter Coal Co.*
298 U.S. 238 (1936) .......... 30

*CFTC v. Noble Metals Int'l, Inc.*,
67 F.3d 766 (9th Cir. 1995) .......... 9

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .......... 3, 27, 61, 62

*Coinbase Fin. Markets v. Nessel*,
No. 25-cv-14092 (E.D. Mich. Aug. 7, 2026); .......... 4

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) .......... 60

*DTCC Data Repository (U.S.) LLC v. CFTC*,
25 F. Supp. 3d 9 (D.D.C. 2014) .......... 10

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 32

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 25

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) .......... 29

*Fednav, Ltd. v. Chester*,
505 F. Supp. 2d 381, 397 (E.D. Mich. 2007), aff'd, 547 F.3d 607 (6th Cir. 2008) .......... 69

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) .......... 61, 66, 67, 71

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) .......... 53

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .......... 65

*Greater New Orleans Broad. Ass'n, Inc. v United States*,
527 U.S. 173 (1999) .......... 22, 28, 63

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982 ........................................................................ 26

*Hencely v. Fluor Corp.*,
146 S. Ct. 108 (2026) ...................................................................... 17

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .................................................................... 38, 67

*Hui v. Castaneda*,
559 U.S. 799 (2010) ........................................................................ 21

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ........................................................................ 58

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) .................................................. 44

*KalshiEx, LLC v. Assad, et al.*,
No. 25-7516 (9th Cir. Aug. 28, 2026) ................................................ 34

*KalshiEX LLC v. Cafferelli*,
2026 WL 2294589, (D. Conn. Aug. 10, 2026) ....................................... 4

*KalshiEX LLC v. Cox*,
No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026) ................... 4

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) ........................................... passim

*KalshiEX LLC v. Johnson*,
832 F.Supp.3d 954 (D. Ariz. 2026)....................................................... 4

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) .............................................. passim

*KalshiEX, LLC v. Schuler* ("Schuler I"),
No. 2:25-CV-1165, 2026 WL 657004
(S.D. Ohio Mar. 9, 2026)................................................... 4, 24, 54, 60

*Kalshiex LLC v. Schuler* ("Schuler II"),
No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)............ passim

*KalshiEX LLC v. Williams*,
No. 25-cv-8846, 2026 WL 2017466, at *4 (S.D.N.Y. July 13, 2026) ... 4

*Kansas v. Garcia*,
589 U.S. 191 (2020) ... 17, 18, 66

*King v. Burwell*,
576 U.S. 473 (2015) ... 20

*Learning Res., Inc. v. Trump*,
148 S. Ct. 628 (2026) ... 20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ... 31, 32

*Medtronic v. Lohr*,
518 U.S. 470 (1996) ... 48

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ... 9, 49, 62

*Murphy v. NCAA*,
584 U.S. 453 (2018) ... passim

*Nessel v. KalshiEX LLC*,
No. 36-1087-CZ (Ingham Cnty. Cir. Ct.) ... 11, 12

*Pulsifer v. United States*,
601 U.S. 124 (2024) ... 56

*Ricci v. Chicago Mercantile Exchange*,
409 U.S. 289 (1973) ... 31

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ... 57, 58

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) ... 33

*Sackett v. EPA*,
598 U.S. 651 (2023) ... 48

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020) ........ 71

*Towerco 2013, LLC v. Berlin Twp. Bd. of Trs.*,
110 F.4th 870 (6th Cir. 2024) ........ 13

*United States v. Minnesota*,
No. 26-cv-2661, 2026 WL 2150211 (D. Minn. July 27, 2026) ........ 4

*United States v. Wisconsin*,
No. 26-cv-749 (E.D. Wis. July 29, 2026) ........ 4

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ........ 18

*West Virginia v. EPA*, ,
597 U.S. 697 (2022) ........ 19, 20

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457, 468 (2001) ........ 18

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ........ 13

*Witzel v. Chartered Sys. Corp. of New York*,
490 F. Supp. 343 (D. Minn. 1980) ........ 64

*Wyeth v. Levine*
555 U.S. 555 (2009) ........ 30, 69, 71

*Yates v. United States*,
574 U.S. 52 (2015) ........ 33, 34, 40, 41

**Statutes**

7 U.S.C. § 1 *et seq.* ........ passim

7 U.S.C. § 1a(18) ........ 10, 14

7 U.S.C. § 1a(47)(A) ........ 33, 38

7 U.S.C. § 1a(47)(A)(i) ........ 35, 40

7 U.S.C. § 1a(47)(A)(ii) .......... passim

7 U.S.C. § 1a(47)(A)(iii) .......... 35, 40

7 U.S.C. § 1a(47)(A)(v) .......... 35, 40

7 U.S.C. § 2(a) (1974) .......... 9

7 U.S.C. § 2(a)(1)(A) .......... passim

7 U.S.C. § 2(e) .......... passim

7 U.S.C. § 5 .......... 8, 36, 51, 69

7 U.S.C. § 5(a) .......... 35, 38, 45, 62

7 U.S.C. § 6(a) .......... 23, 63

7 U.S.C. § 6a .......... 51

7 U.S.C. § 6b .......... 51

7 U.S.C. § 6c(c) .......... 23

7 U.S.C. § 7 (1936) .......... 9

7 U.S.C. § 7a-2 .......... 53

7 U.S.C. § 7a-2(c) .......... 10

7 U.S.C. § 7a-2(c)(1) .......... 10

7 U.S.C. § 7a-2(c)(5) .......... 11, 63

7 U.S.C. § 7a-2(c)(5)(C) .......... 42

7 U.S.C. § 7a-2(c)(5)(C)(i) .......... 42, 43

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) .......... 59

7 U.S.C. § 12a(2) .......... 52

7 U.S.C. § 12a(5) .......... 51

7 U.S.C. § 13 .......... 40, 52

7 U.S.C. § 13a-2(1)-(3) .......... 49, 50

7 U.S.C. § 13a-2(1) .......... 50

7 U.S.C. § 13a-2(7) .......... 52

7 U.S.C. § 16(e)(2) .......... 53, 63

7 U.S.C. § 16(h) .......... 55

7 U.S.C. § 16(h)(2) .......... 55

7 U.S.C. § 27-27f .......... 54

7 U.S.C. § 27a(a) .......... 54

7 U.S.C. § 27a(c) .......... 54

7 U.S.C.§ 27c .......... 54

7 U.S.C.§ 27d .......... 54

7 U.S.C. § 27f .......... 53

7 U.S.C. § 27f(b) .......... 54

15 U.S.C. § 78 *et seq.* .......... 29, 56, 68

15 U.S.C. § 78bb(a) .......... 56

15 U.S.C. § 1172(a) .......... 7

15 U.S.C. § 1261 .......... 49

15 U.S.C. § 2075(a) .......... 49

15 U.S.C. § 3001 *et seq.* .......... passim

15 U.S.C. § 3001(a) .......... 6, 27

15 U.S.C. § 3002(3) .......... 7

15 U.S.C. § 3003 ... 7
18 U.S.C. § 1084 *et seq.* ... passim
18 U.S.C. § 1084(a) ... 5, 25
18 U.S.C. § 1084(b) ... 5
18 U.S.C. § 1955(b) ... 6
25 U.S.C. § 2701 *et seq.* ... passim
25 U.S.C. § 2701(5) ... 26
25 U.S.C. § 2710 ... 26
25 U.S.C. § 2710(b)(1)(A) ... 6
25 U.S.C. § 2710(d)(1)(B) ... 6
28 U.S.C. § 3701 *et seq.* ... 7, 14, 25, 26
30 U.S.C. § 1254(a) ... 57
30 U.S.C. § 1254(g) ... 57
31 U.S.C. § 5361 *et seq.* ... 6, 27
31 U.S.C. § 5361(b) ... 28
31 U.S.C. § 5362(1)(E)(ii) ... 27
31 U.S.C. § 5362(10)(a) ... 7
31 U.S.C. § 5363 ... 28
40 Stat. 1491 (1936) ... 9
88 Stat. 1389 (1974) ... 9, 60
124 Stat. 1376 (2010) ... passim
Mich. Comp. Laws § 432.401 *et seq.* ... 3, 5, 8, 11

Mich. Comp. Laws § 432.402 .......... 66

Mich. Comp. Laws § 432.402(d) .......... 3, 8

Mich. Comp. Laws § 432.404(7) .......... 8, 67

Mich. Comp. Laws § 432.410 .......... 8

Mich. Comp. Laws § 432.411 .......... 8

Mich. Comp. Laws § 432.411(1) .......... 70

Mich. Comp. Laws § 432.412 .......... 8

**Other Authorities**

156 Cong. Rec. S5906-07 (July 15, 2010) .......... 10, 42, 45

*Black's Law Dictionary*
(12th ed. 2024) .......... 9

H.R. Rep. No. 87-967 (1961) .......... 6

*Webster's New World Dictionary* (3rd College ed. 1988) .......... 34, 38

*Webster's Third New International Dictionary* (2002) .......... 38

**Rules**

17 C.F.R. § 1.3 .......... 46

17 C.F.R. § 33.3(a) .......... 23

17 C.F.R. § 38.151(b) .......... 70

17 C.F.R. § 38.4(b) .......... 10

17 C.F.R. § 38.8 .......... 10

17 C.F.R. § 40.11(a)(1) .......... 11, 30

27 C.F.R. § 12a .......... 52

**Treatises**

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........ 21

**Regulations**

75 Fed. Reg. 80572 (Dec. 2, 2010) ........ 70

75 Fed. Reg. 80579 (Dec. 2, 2010) ........ 70

76 Fed. Reg. 44776 (July 27, 2011) ........ 11, 43

76 Fed. Reg. 44786 (July 27, 2011) ........ 43

77 Fed. Reg. 48208 (Aug. 13, 2012) ........ 11, 46

77 Fed. Reg. 48212 (Aug. 13, 2012) ........ 46

77 Fed. Reg. 48246 (Aug. 13, 2012) ........ 46

77 Fed. Reg. 48248 (Aug. 13, 2012) ........ 46

77 Fed. Reg.48247 (Aug. 13, 2012) ........ 11

89 Fed. Reg. 48963 (June 10, 2024) ........ 48

89 Fed. Reg. 48968 (June 10, 2024) ........ 11, 48

89 Fed. Reg. 48982 (June 10, 2024) ........ 62

89 Fed. Reg. 48983 (June 10, 2024) ........ 32

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

If accepted, Polymarket's theory would strip Michigan and other States of their ability to protect citizens from the dangers of sports betting. This case presents complex issues regarding statutory interpretation and federalism. Defendants believe oral argument will assist the Court.

## JURISDICTIONAL STATEMENT

Defendants agree with Polymarket's jurisdictional statement.

## STATEMENT OF ISSUES PRESENTED

Whether the district court abused its discretion in denying Polymarket's motion for preliminary injunction, when (1) Polymarket is unlikely to succeed in showing that the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, preempts Michigan law with respect to Polymarket's sports bets, and (2) the balance of equities tips heavily against Polymarket.

## INTRODUCTION

Michigan took action to enforce its Lawful Sports Betting Act (LSBA), 2019 P.A. 149, Mich. Comp. Laws § 432.401 *et seq*., "in order to protect residents of this state." *See* Mich. Comp. Laws § 432.402(d). Nothing more; nothing less. That is what this case is about.

Polymarket's position requires the Court to believe that Congress decided in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 124 Stat. 1376, to give the CFTC all authority to regulate sports betting, to the exclusion of the States and Tribes, and that no one recognized it for over a decade—not even the Supreme Court in *Murphy v. NCAA*, 584 U.S. 453 (2018). Polymarket argues (Appellant's Br. 51) that Dodd-Frank is an "Interstate Sports Betting Act" in the same way as the Interstate Horseracing Act that this Court recently reviewed in *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631 (6th Cir. 2025). It sounds wrong because it is wrong.

Polymarket argues that in 2010, Dodd-Frank amended the CEA, annihilating the States' centuries long role in regulating gambling in such an obvious manner that it is "expressly preempted" with no

ambiguity that would create a "presumption against preemption." To support its argument, Polymarket dedicates many pages to the legislative history, statutory versions, and caselaw of the CEA in general from the 1930s, 1940s, 1970s, and 1980s. It's unpersuasive.

As described below, both the text of the CEA and the context of its 2010 Dodd-Frank amendments—that brought previously unregulated "swaps" under the regulation of the Commodity Futures Trading Commission (CFTC)—do not support Polymarket's view.

After a series of courts rejected the idea that state sports betting laws were preempted by the CEA,[1] Polymarket has tried to expand the

---

[1] *E.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025); *KalshiEX, LLC v. Schuler* ("Schuler I"), No. 2:25-CV-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *KalshiEX LLC v. Johnson*, 832 F.Supp.3d 954 (D. Ariz. 2026); *Kalshiex LLC v. Schuler* ("Schuler II"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Williams*, No. 25-cv-8846, 2026 WL 2017466, at *4 (S.D.N.Y. July 13, 2026); *United States v. Wisconsin*, No. 26-cv-749, ECF 54 (E.D. Wis. July 29, 2026); *Coinbase Fin. Markets v. Nessel*, No. 25-cv-14092, ECF 57 (E.D. Mich. Aug. 7, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Cafferelli*, 2026 WL 2294589, (D. Conn. Aug. 10, 2026).

*Compare United States v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211, at *10 n.17, *11 n.18, *13 n.20-22, *14 n.23, *15 & n.27 (D. Minn. July 27, 2026) (noting decision might be different if it only addressed sports-betting).

issues to unrelated derivatives. Polymarket based its entire preemptive suit on Michigan's enforcement of its LSBA against the sports bets offered by Polymarket's cohort, Kalshi. Polymarket attempts to muddy the waters, but sports bets are the only contracts at issue in this case.

The District Court correctly rejected Polymarket's implausible theory; this Court should too.

## STATEMENT OF THE CASE

### A. Federal law defers to state gambling policies.

The federal approach to gambling has been to respect States' choices while backstopping gambling that crosses state lines. Gambling regulation falls within the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). For much of this country's history, the States "largely banned" gambling. *Murphy*, 584 U.S. at 458. Today, most States allow some gambling but heavily regulate it.

The Wire Act of 1961, 18 U.S.C. § 1084 *et seq.*, formed the cornerstone of federal gaming law. The Wire Act prohibits "knowingly us[ing] a wire communication facility for the transmission in interstate . . . commerce of bets or wagers . . . on any sporting event or contest . . . ." 18 U.S.C. § 1084(a)–(b). It was part of a larger legislative package to

aid the states "in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities." H.R. Rep. No. 87-967 (1961).

Further showing the broad Congressional understanding of state sovereignty over gambling, other statutes presuppose that States may regulate gambling. When Congress enacted the Interstate Horseracing Act of 1978 (IHA), 15 U.S.C. § 3001 *et seq.*, the Statute expressly provided that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a). The Illegal Gambling Business Act prohibits gambling businesses that involve five or more people, "violat[e] the law of a State . . . in which it is conducted," and meet other criteria. 18 U.S.C. § 1955(b). The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, permits tribes to allow certain types of gaming only if located in "a State that permits such gaming." 25 U.S.C. § 2710(b)(1)(A), (d)(1)(B).

The Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.,* assists in enforcing existing gaming law and defined "unlawful Internet gambling" by reference to whether the wager

is "unlawful under any applicable Federal or State law." *See* 31 U.S.C. § 5362(10)(a). The list goes on. *See, e.g.*, 15 U.S.C. §§ 1172(a), 3002(3), 3003.

For decades the "coherent federal policy" has been to "respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. Congress has made one important departure from that policy: In 1992, Congress passed the Professional and Amateur Sports Protection Act (PASPA), which prohibited most states from legalizing sports gambling. *See* 28 U.S.C. § 3701 *et seq*. PASPA resulted from concern that States might legalize sports gambling, leading to addiction and risking sports integrity. *Murphy*, 584 U.S. at 460-61. But in 2018, the Supreme Court found that PASPA was unconstitutional commandeering. *Id*. at 480.

### B. Michigan regulates sports betting under its longstanding police power.

After *Murphy*, the Michigan Legislature passed the LSBA to establish a "secure, responsible, fair, and legal system of internet sports

betting" to "protect residents" and "capture revenue" in the form of taxes and payments. Mich. Comp. Laws § 432.402(d).[2]

Under LSBA, only a sports betting operator or its licensed internet sports betting platform providers may conduct internet sports betting wagers. *See* Mich. Comp. Laws § 432.404(7). Because sports betting is riskier for young people, Michigan limits sports betting to those twenty-one and older. Mich. Comp. Laws § 432.411. Michigan's exclusion program allows people to place themselves on a voluntary exclusion list. Mich. Comp. Laws § 432.412. Michigan's law also shields against improper sports-betting practices. *E.g.*, Mich. Comp. Laws § 432.410.

### C. The CEA and state gambling regulations have coexisted for decades.

While the States have long regulated gambling, the federal government has regulated financial derivatives. Generally, a "derivative" is a contract whose value depends on the performance of an

[2] By contrast, the CEA's purpose is to serve the national public interest of "managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5.

underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024).

In 1936, Congress enacted the CEA to regulate trading in futures in agricultural commodities, like wheat. Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against price volatility. *Id.* The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover nearly all commodities and other derivatives. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974). Congress also created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

Before 2010, swaps were largely unregulated. *See Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 98 (D.D.C. 2013). Unlike futures, swaps were not required to take place on DCMs. *Id.* at 97–99. That changed after the 2008 financial crisis, when swaps were thought to have contributed to the crisis. *DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 11 (D.D.C. 2014).

Congress responded by passing the Dodd-Frank Act. Dodd-Frank extended the CFTC's jurisdiction to "swaps." *See* 7 U.S.C. § 2(a)(1)(A). Dodd-Frank required all ordinary consumers who wish to trade in swaps to do so on a DCM. § 2(e); *see* § 1a(18).

A DCM seeking to list a new contract for trading may self-certify that the contract complies with federal requirements. § 7a-2(c)(1). Within the certification, the DCM must supply the contract's details. 17 C.F.R. § 38.4(b); *see also* 17 C.F.R. § 38.8. The CFTC may disallow contracts that fail to satisfy requirements. § 7a-2(c). If the CFTC does not act, a self-certified contract becomes effective for trading. *See id.*

Congress did not want sports betting to occur on DCMs. *See, e.g.*, 156 Cong. Rec. S5906-07 (July 15, 2010). To that end, it enacted the "Special Rule," which authorizes the CFTC to disallow contracts that

involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or (as relevant here) "gaming." 7 U.S.C. § 7a-2(c)(5).

Since the passage of Dodd-Frank, the CFTC has taken the consistent view that sports bets are not swaps and that it does not have the "statutory mandate" nor expertise to regulate gambling. *See* 17 C.F.R. § 40.11(a)(1); 76 Fed. Reg. 44776, 44786 (July 27, 2011); 77 Fed. Reg. 48208, 48247-8 (Aug. 13, 2012); 89 Fed. Reg. 48968, 48983 (June 10, 2024). Although the CFTC now claims authority to regulate sports betting (*see* CFTC Amicus, Doc. 20), that is an abrupt about-face, and its regulation prohibiting gaming on DCMs remains on the books.

### D. Polymarket preemptively sued Michigan officials and the District Court denied Polymarket's requested injunction.

In March 2026, the Michigan Attorney General filed a lawsuit in state court against Polymarket's cohort, KalshiEx, LLC (Kalshi), alleging the DCM and prediction market company violated Michigan's LSBA by offering internet sports betting without a license. *Nessel v. KalshiEX LLC*, No. 36-1087-CZ (Ingham Cnty. Cir. Ct.), Dkt. No. 1. The Complaint asks the court to declare Kalshi's internet sports betting

operation a common law nuisance and to issue a permanent injunction. *Id*. at 21.

Polymarket filed this preemptive lawsuit the next day and sought a temporary restraining order (TRO) and preliminary injunction. Compl., R.1, PageID#1-26; P.I. Mot., R.13&14, PageID#50-89. Polymarket explicitly cited Michigan's action against Kalshi as the reason for its request for injunctive relief. P.I. Mot., R.14, PageID#72-73, 86. Polymarket claims that the CEA preempts Michigan's sports-betting laws.

The District Court denied the TRO on March 10, 2025. T.R.O. Op., R.17, PageID#235. After full briefing, the District Court denied preliminary relief. Op., R.41, PageID#1130. It held that sports bets are not "swaps." *Id.*, PageID#1100-18. The court also found that—even assuming that Polymarket's sports bets are swaps—Congress did not expressly or impliedly preempt the States' regulatory authority over sports betting. *Id.*, PageID#1119-27. Finally, the court concluded that the balance of equities favored Michigan. *Id.*, PageID#1128-9.

## STANDARD OF REVIEW

To obtain the extraordinary relief of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

This Court reviews the district court's decision on a preliminary injunction "under the deferential abuse of discretion standard." *Towerco 2013, LLC v. Berlin Twp. Bd. of Trs.*, 110 F.4th 870, 879 (6th Cir. 2024). "In applying this standard of review, this Court reviews questions of law de novo, . . . and reviews factual determinations for clear error." *Id.* "The district court's ultimate determination regarding the preliminary injunction factors will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (cleaned up).

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion in denying Polymarket's motion for a preliminary injunction.

Polymarket is unlikely to succeed on the merits. Three clear statement rules guide the analysis of the statutory text: the major questions doctrine, the federalism canon, and the presumption against implied repeals of other federal laws. Sports betting is a multi-billion-dollar industry that has historical and political significance because it removes a fundamental police power of the States. *See* 7 U.S.C. § 2(e); *id.* § 1a(18). Congress would not have impliedly repealed the cornerstone of interstate gambling law (the Wire Act), or other federal laws (IHA, IGRA, PASPA) without a clear statement.

Polymarket's contracts are not "swaps" or other commodity derivatives, so its preemption argument fails at this threshold. Polymarket attempts to avoid this by arguing the CFTC has "exclusive jurisdiction" over *any* contract traded on a DCM. That is not what the statute says: The CFTC's "exclusive jurisdiction" applies only to specified derivatives, including "swaps." 7 U.S.C. § 2(a)(1)(A). Further, it is this Court's job to say what the law is, not the CFTC. The

statutory text, context, and purposes of the CEA all show that sports bets are not swaps.

Even if Polymarket's sports bets were within the CFTC's jurisdiction, the CEA would not preempt all state gaming law. The regulation of gaming is at the heart of the States' police power, and giving all of that power to the CFTC would have vast economic and political consequences. Nothing in the CEA shows the exceptionally clear congressional intent that would be required for that result.

Polymarket argues that the CEA's "exclusive jurisdiction" provision expressly preempts Michigan gaming law. That provision says *nothing* about preempting state gaming law. When Congress wanted to expressly preempt state law in the CEA, it said so.

Polymarket also argues field preemption. Nothing in the CEA shows that Congress intended the regulated field to include *sports betting* in particular. The CEA also provides no rules for regulating gaming, except to authorize the CFTC to prohibit gaming contracts on DCMs (which the CFTC did).

Finally, Polymarket argues conflict preemption. But Polymarket could comply with both Michigan law and the CEA—it chooses not to.

Polymarket says complying with Michigan law would violate the CFTC's "impartial access" requirement, but there is no conflict. Even if there was, that would only excuse compliance with the conflicting provision of Michigan law—not all Michigan gaming law. Further, Michigan gaming law does not pose any obstacle to fulfilling the CEA's purposes: Congress enacted the CEA to regulate commodity futures and other derivatives, not to federalize sports betting.

Finally, if Michigan's sports-betting laws are enjoined, the State and its citizens will be irreparably harmed, which outweighs Polymarket's monetary interests.

## ARGUMENT

### I. Polymarket is unlikely to succeed on the merits.

To prevail on the merits, Polymarket must show both that: (1) its sports bets are swaps (or other commodity derivatives) under the CEA so that the CEA even applies, and (2) if the CEA applies, Congress intended to preempt all state gaming law as to those contracts. Polymarket cannot show either. *See Schuler II*, 2026 WL 1295806, at *3. It is not, as Polymarket claims, that some preemption over

something (traditional derivatives) means all preemption over everything, including sports bets.

Polymarket's position requires the Court to believe that Congress secretly decided in Dodd-Frank to give the CFTC all authority to regulate sports betting, to the complete exclusion of the States and Tribes, and that no one recognized it for over a *decade*—not even the Supreme Court in *Murphy*. *See Martin*, 793 F. Supp. 3d at 683. After all, the laws relevant here were in place when the Supreme Court reaffirmed that the States are "free to act" on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486. According to Polymarket, *Murphy* was a meaningless decision on a moot issue. Polymarket is wrong.

### A. Federal preemption turns on the statutory text and three binding clear statement rules govern that textual analysis.

Federal preemption can take different forms: federal statutes sometimes preempt expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). "But, there is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026)

(cleaned up). That means that "all preemption arguments," no matter their form, "must be grounded" in text. *Kansas*, 589 U.S. at 208.

Courts apply standard statutory interpretation principles to decide federal law's "preemptive effect." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., op.). "Part of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions." *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted). To "correctly read[]" statutory law, courts must remain "aware[] of certain presuppositions" about the traditional division of powers. *Id.* (quotation omitted).

Congress, moreover, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That is, when Congress seeks to alter the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Requiring such clarity ensures "that the legislature has in fact faced, and intended to bring into issue," the major change at stake. *Bond*, 572 U.S. at 858 (quotation omitted). The Supreme Court has synthesized these expectations—about how Congress legislates—into several clear-statement rules that guide how courts read statutes. *West Virginia v.*

*EPA*, , 597 U.S. 697, 736–37 (2022) (Gorsuch, J., concurring). Three rules are critical here.

**Federalism Canon.**

First, the federalism canon arises from "basic principles of federalism embodied in the Constitution." *Bond*, 572 U.S. at 859. The Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Id.* at 854. That scheme leaves the States with significant police powers, which they exercise for the public good. *Id.* at 854. Against that "backdrop," any statute that displaces or limits significant state power constitutes a major change. *See id.* at 857. Thus, absent a "clear statement," courts should not assume "a significant change in the sensitive relation between" the federal and state governments in areas of "traditional state authority." *Id.* at 858-59 (quotation omitted); *accord Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (*per curiam*).

**Major-Questions Doctrine.**

The second pertinent clear-statement rule is the major-questions doctrine. The doctrine teaches courts to employ "common sense as to the manner in which Congress would have been likely to delegate"

power to federal agencies. *West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted). "Extraordinary grants of regulatory authority," the Supreme Court has said, "are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723 (cleaned up). Accordingly, if an agency claims "broad, expansive power on an uncertain statutory basis," courts should be skeptical. *Learning Res., Inc. v. Trump*, 148 S. Ct. 628, 639 (2026) (Roberts, C.J., op.).

The major-questions doctrine applies to matters of great economic or political significance. *West Virginia* , 597 U.S. at 721. The doctrine thus kicks in when agencies claim expansive power over matters involving "billions of dollars" and implicating "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015). In *Alabama Association of Realtors*, for example, the Supreme Court viewed $50 billion in "economic impact" as implicating the doctrine. 594 U.S. at 764. The agency there was also intruding "into an area that is the particular domain of state law," so the need for a clear statement was doubly apparent. *Id.*

**Presumption against implied repeals.**

The third pertinent clear-statement rule is that "[r]epeals by implication are not favored and will not be presumed absent a clear and manifest legislative intent to repeal." *Hui v. Castaneda*, 559 U.S. 799, 800 (2010). The presumption is founded on the principle that congress passes laws "with full knowledge of existing ones on the same subject." *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 328. Requiring a "clear[ ] statement" for implied repeals "reflect[s] common sense as to the manner in which Congress is likely" to do so. *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (cleaned up).

**1. The major questions doctrine applies because sports betting is a politically and historically significant multi-billion dollar industry.**

Sports betting has been illegal for much of this country's history, and it remains illegal in many States, but has quickly ballooned into a multi-billion-dollar industry involving millions of Americans. *Supra* at 5-7. Last year, over one-in-five adults bet on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT.

Americans wagered almost $167 billion on sports in 2025. Catherina Gioino, *Gambling becomes America's favorite pastime as Americans spend more on sports bets than movies, arts, museums, and music combined*, Fortune (Jul. 26, 2026), https://tinyurl.com/yje8srnp. Sports betting thus easily meets the major-questions doctrine's economic thresholds. *See King*, 576 U.S. at 485; *Ala. Ass'n of Realtors*, 594 U.S. at 764.

#### 2. The federalism canon applies because if "swaps" included sports betting and preemption applied, all sports betting would be regulated *only* by the CFTC.

Federalizing sports betting would massively upset the federal-state balance. "[T]he regulation of gambling lies at the heart of the state's police power." *Schuler II*, 2026 WL 1295806, at *5; *see Ah Sin*, 198 U.S. at 505-06. And federal law has historically "defer[red] to, and even promote[d] differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v United States*, 527 U.S. 173, 187 (1999). It follows that Polymarket's theory—under which the States effectively lose their sports-betting authority—would be "a significant change in the sensitive relation between" the federal and state

governments in an area of "traditional state authority." *See Bond*, 572 U.S. at 858–59 (quotation omitted).

Section 2(e) makes it "unlawful" for "any person" to "enter into a swap" unless that swap "is entered into on, or subject to the rules of, a [DCM]," except when both parties are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18).[3] "For that provision to make any sense, swaps must be identifiable as swaps without regard to whether they were traded on a designated market." Op., R. 41, PageID#1117. For ordinary consumers, swaps *cannot* be traded off market. § 2(e). So, if sports bets qualify as swaps, *see* § 1a(47)(A)(ii), the States *cannot* allow them to occur via state regulated processes, *see* § 2(e). That would make the CFTC the nation's sole regulator of sports betting.

Thus, Polymarket's promise (Appellant's Br. 28) that its position would leave the States with power to regulate sports betting off-DCMs is illusory. And state-licensed sportsbooks operating without DCM

[3] Similarly, Section 6(a) requires *all* futures in the U.S. be traded on DCMs. *See* 7 U.S.C. § 6(a). Section 6c(c) also directs the CFTC to issue regulations requiring all options be traded on DCMs, 7 U.S.C. § 6c(c); *see* 17 C.F.R. § 33.3(a).

registrations (which is to say, all of them), along with their millions of customers, would be felons under federal law. *Schuler I*, 2026 WL 657004, at *6.

To reach that outcome, the Court would have to believe that when Congress added "swaps" to the CEA, it intended to take away the longstanding police power of the States and Tribes to regulate sports-betting, *see Schuler II*, 2026 WL 1295806, at *5 and give it all to the CFTC. And the way Congress supposedly did this was by allowing the CFTC to decide company-by-company how much sports betting to allow, based on which DCMs it certifies and which contracts it reviews.

Thus, Polymarket's theory would lead to an immense shift in power, which implicates the major questions doctrine and federalism canon. Polymarket thus would need to show exceptionally clear congressional intent to preempt state gaming law. *Bond*, 572 U.S. at 858-59. If the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted). Nothing in the CEA shows the necessary intent to preempt state sports betting laws.

### 3. Polymarket's view would impliedly repeal other federal laws.

While this case involves Michigan law, Polymarket's position implicates other federal laws. That proves significant because courts have a "duty to interpret Congress's statutes as a harmonious whole." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Courts thus employ a strong presumption against implied repeals. *Id.* at 510.

Polymarket's view of the CEA would require finding that Congress impliedly repealed the Wire Act, IGRA, PASPA and IHA. *See Martin*, 793 F. Supp. 3d at 683. But there is a strong presumption against repeals by implication. *Epic Sys. Corp.*, 584 U.S. at 510.

**The Wire Act**

The Wire Act makes it a federal crime to use interstate wire communication facilities, including the internet, to place bets or wagers on "any sporting event," except where such wagers are legal in both the sending and receiving State. 18 U.S.C. § 1084(a). But if Congress legalized interstate sports betting under the CEA (regardless of state law)—it nullified the Wire Act. *Martin*, 793 F. Supp. 3d at 683.

**IGRA**

IGRA gives Tribes the "exclusive right" to determine whether and to what extent to allow gaming under federal and state law on tribal land, 25 U.S.C. § 2701(5), and it contains a comprehensive scheme to regulate that gaming, *see id.* § 2710. But if the CFTC truly calls the shots, that right vanishes as to sports betting, overriding the Tribes' authority and disrupting that scheme. *Martin*, 793 F. Supp. 3d at 683.

**PASPA**

As discussed above, it would also require impliedly repealing PASPA, which prohibited the States from further legalizing sports betting at the time of Dodd-Frank. *See Murphy*, 584 U.S. at 460–61. There is no reason to think Congress attempted to make that prohibition meaningless. And the Supreme Court's decision in *Murphy*, invalidating PASPA while recognizing and reinforcing the States' power to regulate sports betting, 584 U.S. at 484, would also be meaningless. This Court should not interpret the CEA to produce those absurd results. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

**IHA**

Despite repeatedly citing (and misunderstanding) *Churchill Downs*, the most recent case interpreting the IHA, Polymarket fails to even acknowledge that its definition of swap would sweep in bets on horseracing. The IHA establishes the exclusive federal legal framework for betting on interstate horseracing, which requires the consent of three entities, none of which are the CFTC. *Churchill Downs,* 162 F.4th at 636. This creates a clear conflict between the CEA and the IHA.

The IHA also reiterated the longstanding federal policy that "*States* should have the *primary responsibility* for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a). Polymarket's position thus requires an implied repeal of the IHA too.[4]

The Wire Act, IGRA, and IHA[5] confirm that Congress knows how to regulate gambling. Read as a whole, federal law promotes state

[4] Notably, Polymarket recently listed (and took down) horseracing bets. Brad Senkiw, *Polymarket Shuts Down Kentucky Derby Contract at Churchill Downs' Request*, Covers (April 30, 2026), https://tinyurl.com/43ky4nb7.

[5] Polymarket's cohorts argued that UIGEA defines "bet or wager" to exclude transactions on DCMs. *Id.* at § 5362(1)(E)(ii). But UIGEA targets funding illegal online betting and that definition is explicitly

gambling regulations. *See Greater New Orleans*, 527 U.S. at 187. Polymarket's position does the opposite, yet another sign that it is wrong.

### B. Sports bets are not "swaps" under the CEA.

All of Polymarket's arguments rest on the CEA's exclusive-jurisdiction provision. In relevant part, that provision says:

> The Commission shall have exclusive jurisdiction … with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a [DCM] . . . .

§ 2(a)(1)(A). The "exclusive jurisdiction" provision only applies to products involving "swaps" or "contracts of sale of a commodity for future delivery," not anything and everything a DCM chooses to list. The text limits the CFTC's "exclusive jurisdiction" to only certain "accounts, agreements, … and transactions." § 2(a)(1)(A). Specifically, the phrase "involving swaps or contracts of sale of a commodity for

---

limited to the relevant "subchapter" of the Federal Code; it explicitly does nothing to "alter[]" or "limit[]" other federal or state "gambling" laws. *See id.* at §§ 5363, 5361(b).

future delivery" modifies the earlier list of nouns ("accounts, agreements, … and transactions"). § 2(a)(1)(A); *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 402–03 (2021) (discussing the series-qualifier canon). Thus, the only agreements and transactions within the CFTC's "exclusive jurisdiction" are those involving "swaps" or futures trading in "commodit[ies]." *See* § 2(a)(1)(A).

The context dictates the same result; "agreements" is followed by a parenthetical list clarifying the types of agreements (including "option[s]") that fall within the CFTC's exclusive jurisdiction. § 2(a)(1)(A). That list would be pointless if all agreements on DCMs were automatically within the CFTC's exclusive jurisdiction.

In addition, Polymarket's all-contracts-on-DCM-are-preempted argument[6] (Appellant's Br. 55) would create conflict with other federal laws. Polymarket could list for trading a security (subject to the jurisdiction of the SEC, not the CFTC) but self-certify that the contract was actually a swap. Such an action would violate the Securities Exchange Act of 1934 (SEA), 15 U.S.C. § 78 *et seq.*, which prohibits

---

[6] Polymarket failed to preserve this argument, but Polymarket's recent listing "on market" of horseracing bets further implicates conflict with IHA. *See footnote* 5.

exchanges not registered with the SEC from listing or trading securities. It would also lead to an unconstitutional result that private parties—just by listing a contract—can preempt state law. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

Thus, if a contract is not one of the listed commodity derivatives, which must be identifiable without regard to whether they are traded on market, Section 2(a)(1)(A) simply does not apply, and "[Polymarket]'s theory never gets off the ground." Op., R. 41, PageID#1100.

#### 1. Courts interpret what authority is delegated by Congress, not the CFTC.

Michigan is not challenging the CFTC's failure to enforce its own regulations. *See* 17 C.F.R. §40.11(a)(1). Michigan merely seeks to enforce state law directly against Polymarket. Whether Michigan may do so turns on whether federal statutes preempt Michigan law. That is a matter for courts to decide, not the CFTC. *See Wyeth v. Levine*, 555 U.S. 555 at 576 (2009) (refusing, even during the *Chevron* era, to defer "to an agency's conclusion that state law is preempted").

This case turns on statutory interpretation, and "agencies have no special competence in resolving statutory ambiguities," especially when

it comes to "the scope of an agency's own power"—that is the circumstance in which following the agency's views is "least appropriate." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024). Because the CFTC's new reading of statutes departs from the CFTC's prior guidance and elevates its own authority, this case presents a scenario where "abdication in favor of the agency is *least* appropriate." *See id.* at 401.

As the district court correctly noted, when Congress gave the CFTC authority to "further define" swap, "it did not confer upon it the authority to erase Congress's definition and declare that up is down and black is white." Op., R. 41, PageID#1114-5. The "exclusive jurisdiction" provision also "does not deprive the courts of their duty to fulfill the 'traditional conception of the judicial function' by defining what the law is." *Id.* (citing *Loper Bright*, 603 U.S. at 396).

Polymarket cites *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289 (1973). However, *Ricci* arose from a dispute between a member of an exchange and the exchange itself, alleging violations of the CEA related to membership rules for the exchange and had an express process for review in the CEA. *Id.* at 291-92, 295-96, 305.

The CFTC's view would not even be entitled to deference in the pre-*Loper-Bright* era. Before *Loper-Bright*, deference was only warranted when the agency's "interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 603 U.S. at 386.

As recently as 2024, the CFTC explained that derivatives trading and gambling are different, and the CEA is "focused on regulating financial instruments and markets, and do[es] not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." 89 Fed. Reg. at 48983. The CFTC concluded that it has neither "the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id*.

The CFTC's failure to explain this about-face should be viewed with skepticism. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (when the agency changes its interpretation without acknowledgment or explanation, it is "arbitrary and capricious").

### 2. Sports bets are not swaps under the plain statutory text.

The CEA's definition of "swap" reflects that swaps are financial instruments used to hedge existing financial risk. 7 U.S.C. § 1a(47)(A). The definition of swaps contains six parts, all of which refer to specific financial measures, indices, or instruments used to hedge risk. By contrast, people who gamble on sports do not seek to hedge existing financial risks; they create the risk by betting.

Polymarket relies on part (ii), which covers a "contract . . . that provides for any . . . payment . . . that is dependent on the occurrence [or] nonoccurrence, or the extent of the occurrence . . . of an event or contingency . . . associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Polymarket seeks to give this definition its broadest possible reading, to reach contracts on "any and all things that happen." T.R.O. Op., R.17, PageID#231.

But courts do not interpret individual definition provisions in isolation and as expansively as possible. *See Yates v. United States*, 574 U.S. 528, 543-44 (2015). Instead, they read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

Here, part (ii) should be read in context to also cover financial instruments based on economic events that are used for hedging risk. *Hendrick*, 817 F.Supp.3d at 1027-8; *see Yates*, 574 U.S. at 543-44 (*noscitur a sociis* canon). *See infra* at 39-43.

Thus, contracts must satisfy two conditions to be swaps under this definition. They must depend on the occurrence of something that is "associated with a potential financial, economic, or commercial consequence." *Id.* And the occurrence must be significant enough to be classified as "an event." *Id.* Polymarket's sports bets satisfy neither condition. *See KalshiEx, LLC v. Assad, et al.*, No. 25-7516, Doc. 200.1 at 31-33 (9th Cir. Aug. 28, 2026).

***Economic consequences***

The first problem is that Polymarket allows betting on things that are not sufficiently connected to economic consequences. The critical statutory phrase is "associated with." § 1a(47)(A)(ii). To "associate" means to naturally "connect" or "join" things together. *Webster's New World Dictionary* 83 (3rd College ed. 1988). The statutory definition thus refers to events that bear a close or inherent relationship to potential economic consequences.

This limitation ensures that the definition captures contracts on occurrences that create risks against which businesses would want to hedge—such as whether a company's bond defaults. Polymarket's interpretation essentially deletes the term "associated" so that part (ii) would read as follows: "event or contingency ~~associated~~ with . . . financial, economic, or commercial consequences."

Other parts of the CEA reinforce that understanding. As discussed below (at 43-46), the "transactions subject" to the CEA must serve meaningful risk-management or price-discovery interests. *See* § 5(a). As detailed below, the surrounding swap definitions involve financial instruments with real economic stakes. *See* §§ 1a(47)(A)(i), (iii), (v).

This reading of "associated with" makes particular sense because "the good textualist is not a literalist." *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026) (quotation omitted) (interpreting "relating to"). If the Court reads "associated with" too broadly, it becomes "meaningless." *See id.* at 1060 (quotation omitted). After all, "everything" is associated with "everything else" in some loose sense. *See id.* at 1060–61 (quotation omitted).

Sports bets fail the economic-consequences requirement. Sports are big business, but the economics of that business do not depend on the outcome of each isolated game. A game's final score is not an occurrence people use for price discovery or to hedge against economic risk. *Contra* § 5(a). Worse still for Polymarket, most sports bets it offers are far more obscure than "which team wins": they involve things like whether a team covers a point spread, the total combined points in a game, or the statistical performance of players. No one[7] uses such arbitrary sports bets (like whether Lebron James will score more than 20 points on Tuesday, or whether Ohio State and Michigan will combine for more than 50.5 points) to protect against financial risks. There is no meaningful economic consequence to these occurrences alone. Recall also that Polymarket offers parlays, which allow users to combine dozens of different bets within a single wager.

The use of the word "potential" does not bless Polymarket's argument. The statute's use of "potential" undoubtedly signals that an event may lay the foundation for a swap even if economic consequences

[7] The exception might be the players, coaches, and other similar insiders, but they cannot bet on their own games.

are not guaranteed. But statutory definition still requires that an event be "associated with" potential economic consequences. § 1a(47)(A)(ii); see also *Plaquemines Par.*, 146 S. Ct. at 1061.

Further, Polymarket apparently wants a preliminary injunction halting *any* enforcement of Michigan law against it. To justify that broad relief, Polymarket must show that *every* sports bet it offers falls within the CEA. Even if the Court thinks some sports bets have sufficient economic consequences to qualify as a swap, that does not justify enjoining Michigan law in all applications. Polymarket must run the table and establish preemption as to every sports bet it offers. If this Court finds that at least some of the obscure sports bets Polymarket offers are not sufficiently associated with economic consequences, then Polymarket loses.

***Outcomes versus events***

The next problem for Polymarket: not everything that happens is important enough to be called "an event." That matters here because, to satisfy the swap definition, a contract must depend on "the occurrence" of "an event." § 1a(47)(A)(ii).

The CEA's definition of "swap" reflects that swaps are financial instruments used to hedge existing financial risk. 7 U.S.C. § 1a(47)(A). The statute uses different words, "occurrence" and "event," to describe different happenings. Because Congress chose to use different words, they presumably have distinct meanings. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017). "[O]ccurrence is the general word for anything that happens or takes place." *Webster's New World Dictionary* 937 (3rd College ed. 1988). An "event" is also "an occurrence," but one of greater "relative significance." *Id.* Thus, an event is "a noteworthy occurrence." *Webster's Third New International Dictionary* 788 (2002). The word "event" therefore *limits* the word "occurrence." That makes sense: if swaps could be about anything that happens (no matter how unimportant), swaps would cease to be meaningful financial instruments. *Contra* § 5(a).

Per § 1a(47)(A), "swaps" does not capture the occurrence of an "outcome." "Outcome" has a more specific meaning than the word "event." It normally refers to a "result" that "comes out of or follows an activity." *Webster's Third New International Dictionary* 1601 (2002). For a contract to be a swap, the contract's payment must depend on

whether that identified "event," *itself*, occurs. § 1a(47)(A)(ii). A contract that takes as a given that an event (game) is going to occur and instead depends on the outcome (who wins) of the event, does not satisfy the definition.

If this Court reads "event" too broadly, then everything becomes the basis for a swap. The number of points scored. Whether an announcer will say the words "tush push." Whether the coin toss will be heads or tails. These were real bets on DCMs, and none involves an occurrence that is significant enough to be an "event."

***No limiting principle***

Polymarket's position is that because every outcome could be an event and every event has some possible downstream economic consequence, every event contract qualifies as a "swap." Its view knows no limiting principle. *Hendrick*, 817 F.Supp.3d at 1027.

Every event "might have some conceivable financial consequence if one is creative enough." *Id*. For example, two parents betting on which team wins a Little League game would qualify as a "swap" under Polymarket's view, because the winning team might eat celebratory pizza. And because all consumer swaps must be traded on DCMs, the

parents would be federal felons. 7 U.S.C. §§ 2(e), 13. Polymarket's definition of "swap" cannot be correct.

#### 3. The statutory and regulatory context confirms sports bets are not "swaps."

Polymarket's reading of part (ii) of the "swap" definition makes no sense when viewed in its statutory context. First, it ignores that every other part of the "swap" definition concerns financial instruments used to hedge economic risk. *Id.* For example, one of the surrounding definitions lists 22 different transactions—including "weather swap[s]" and "credit default swap[s]"—that parties commonly use to transfer "financial risk." § 1a(47)(A)(iii). Another definition zeroes in on certain security-based swap agreements that parties use to counteract market "volatility." § 1a(47)(A)(v). Still another definition covers financial instruments that involve "financial or economic interests" such as "rates, currencies, commodities, securities, instruments of indebtedness, indices, [or] quantitative measures." § 1a(47)(A)(i). These all concern financial instruments that are used to hedge risk, which, under the canon of *noscitur a sociis*, inform the meaning of part (ii). *See Yates*, 574 U.S. at 543-44.

Further, it makes the rest of the definition superfluous—if part (ii) reaches contracts "on anything that happens or could happen," then the remaining parts are left with nothing to do. *Hendrick,* 817 F.Supp.3d at 1027; *see Yates*, 574 U.S. at 546. Polymarket argues (Appellant's Br. 45-47) that the six-part definition is intended to overlap, but it never explains how its broad reading of the second definition leaves work for the others. Under Polymarket's limitless reading, for instance, there would be no need to individually list many of the swaps identified in the third definition. *See* § 1a(47)(A)(iii).

Polymarket argues (Appellant's Br. 50) that the Special Rule proves that some swaps involve gaming. That is incorrect. The Special Rule confirms that "swaps" should not be interpreted to allow sports betting.

Polymarket repeatedly relies on the suggestion that event contracts are always swaps. But the definition in § 1a(47)(A)(ii) makes clear that not all event contracts are swaps. Congress included only those event contracts that hedge risks in a manner similar to a swap and are sufficiently "associated with a potential financial, economic, or

commercial consequence." Read otherwise, there would be no limiting principle.

The CEA's Special Rule uses "event contracts" as a broader term than "swap." *See* § 7a-2(c)(5)(C). Event contracts may consist of "agreements, contracts, transactions, *or* swaps." *Id.* (emphasis added). This aligns with the limiting language in the definition. Event contracts are not always swaps; they can also be other "agreements, contracts, [or] transactions." *Id.* Not all event contracts, it follows, are within the CFTC's exclusive jurisdiction. *See* § 2(a)(1)(A). It also follows that the CFTC's special-rule authority over event contracts is *not* a proper surrogate for discerning the CFTC's exclusive jurisdiction over swaps.

The Special Rule is a safety-valve provision that allows the CFTC to prohibit certain event contracts—about things like war, terrorism, and gaming—from being listed on DCMs as against the public interest. 7 U.S.C. § 7a-2(c)(5)(C). Congress did not want sports betting on DCMs. *See* 156 Cong. Rec. S5906-07. So, in the Special Rule, Congress gave the CFTC authority to ban contracts involving "gaming" from DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i).

Notably, the Special Rule is not limited to gaming but also applies to contracts involving, for example, assassination. *Id.* It does not show that Congress intended for the CFTC to regulate gaming generally, any more than it intended the CFTC to be the arbiter of assassination event contracts. Further, the Special Rule allows the CFTC to bar contracts involving conduct that is "unlawful" under "State law." *Id.* That "reflects an affirmative intent to *preserve* state laws," rather than supplant them. *Martin*, 793 F. Supp. 3d at 680.

Regardless, Polymarket cannot rely on the Special Rule to *authorize* sports betting on DCMs when the CFTC has exercised its authority under it to categorically *ban* contracts involving "gaming" on DCMs. 17 C.F.R. § 40.11(a). The CFTC did that specifically to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011) (internal quotation marks omitted). The terms of the regulation are clear and unequivocal: DCMs "shall not list" any contracts that "involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). Polymarket *never even mentions* this prohibition in its brief.

#### 4. A broad interpretation of "swaps" is inconsistent with Dodd-Frank's purposes and the CFTC's regulations.

Interpreting "swap" to cover sports betting is not consistent with Congress's purposes in enacting the Dodd-Frank Act. Congress added "swaps" to the CEA to strengthen regulation of financial markets following the 2008 financial crisis, because unregulated credit default swaps had exacerbated the crisis. *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172-73 (D.D.C. 2012). Congress "aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability." *Hendrick,* 817 F.Supp.3d at 1028-9.

The Dodd-Frank Act was not about regulating sports or election betting. "Congress was bringing risky financial products out of the shadows," not "enabling nationwide gambling." *Id.* at 1031. Sports betting did not contribute to the financial crisis. It was illegal everywhere but Nevada. *See Murphy*, 584 U.S. at 462.

The purpose of the CEA is to improve commodities markets by facilitating hedging and price discovery. The CEA itself provides that "[T]ransactions subject to" the CEA "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing

information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Extending the definition of swap to include sports betting does not serve those purposes. Nor, at the time of Dodd-Frank, were sports bets "entered into regularly in interstate and international commerce." *Id*. (emphasis added). Sports betting would *not* have been entered into regularly in *interstate* and *international* commerce, as it was illegal each time the CEA was amended, apart from horseracing, which was governed by the IHA. *Supra* at 5-7.

The only mention of sports betting in the legislative history makes clear that Congress did *not* want that gambling to occur on CFTC-regulated DCMs. *See* 156 Cong. Rec. S5906-07 (Senators Feinstein and Lincoln explaining that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament"—but that "[t]hese types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling"). Thus, Congress recognized that sports bets are not swaps.

Further, the CFTC's own regulations reject a maximalist reading of "swap." In 2012, it promulgated a regulation defining "swap" to

exclude "consumer and commercial arrangements that historically have not been considered swaps"—such as "traditional insurance products," "mortgages," "automobile loans," and "employment contracts." Further Definition of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3. The CFTC explained that those contracts historically were regulated by States, and that there was no indication that Congress "intended" for those contracts "to be regulated as swaps." 77 Fed. Reg. at 48212 & n.29; *see id.* at 48246.

That reasoning applies equally to sports bets. Sports bets do "not involve risk-shifting arrangements with financial entities"—the hallmark of a swap. 77 Fed. Reg. at 48248. They are consumer transactions that people enter "primarily for personal [entertainment] purposes" and that "historically have not been considered to involve swaps." *Id.* at 48246-47. Like insurance and mortgages, sports bets historically have been regulated by the States. *Murphy*, 584 U.S. 484. There is no indication that Congress intended for them to be regulated as "swaps."

### C. The CEA does not preempt the States' authority over sports betting.

Even if Polymarket's sports bets qualified as swaps, Polymarket has still failed to show that the CEA preempts application of state gaming law to those bets. The plain language of the CEA and the CFTC's rules leaves no doubt that state law does not "conflict with the federal law" in the first place, and no basis for preemption exists under any of the three theories. *Martin*, 605 U.S. at 410 (where a federal statute "incorporates state law, in most cases there is no conflict for the Supremacy Clause to resolve"). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (cleaned up).

Throughout its brief, Polymarket cites statutory history to show that Congress intended the CEA to preempt certain state regulation of commodity derivatives. But none of that history shows an intent to preempt state regulation of *sports betting*. *See Martin*, 793 F. Supp. 3d at 682. The only mention of sports betting in the legislative history

confirms Congress did *not* want sports betting on DCMs. *See* 156 Cong. Rec. S5906-07.[8]

Polymarket cannot meet its burden to show that Congress specifically considered sports betting and chose to override all state gaming regulation.

**1. Express preemption does not apply.**

Polymarket claims that the "exclusive jurisdiction" language in § 2(a)(1)(A) expressly preempts all state gaming laws as to its sports bets. This view takes the most expansive view of that provision possible. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), or read preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in areas of traditional state regulation, *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996).[9]

Section 2(a)(1)(A) is not an express-preemption provision. Congress expressly preempts state law "by enacting a clear statement

---

[8] The CFTC's guidance and rules confirm that "the Commission is not a gaming regulator." 89 Fed. Reg. 48963, 48968 (June 10, 2024).

[9] Polymarket argues (Appellant's Br. 24) that courts should not apply the presumption against preemption to express-preemption provisions. But the Supreme Court has done so. *See, e.g.*, *Altria*, 555 U.S. at 70.

to that effect." *Am. Apparel & Footwear Assoc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) (internal quotation marks omitted). That is, the provision must say that state law is preempted or that state authorities may not act. For example, statutes may provide that "no State or political subdivision of a State" may "establish" a product-safety standard different from a federal standard. *See id.* (citing 15 U.S.C. § 1261 note (b)(1)(B) and 15 U.S.C. § 2075(a)).

Section 2(a)(1)(A) describes the jurisdiction of the CFTC but says nothing about the jurisdiction of the States. As the Supreme Court explained, Congress enacted this provision "only to consolidate federal regulation of commodity futures trading in the [CFTC]"—that is, to "separate the functions of the [CFTC] from those of the [SEC]" and other federal agencies. *Merrill Lynch*, 456 U.S. at 386-87. In other words, it prohibits duplicative regulatory schemes over commodities trading.

Arguably, the exclusive jurisdiction relates to the CFTC's exclusive authority to enforce the CEA. Of course, even that "exclusive jurisdiction" for enforcing the CEA would be subject to the exception in the savings clause, which is consistent with § 13a-2(1)-(3) (giving state

regulators' ability to enforce the CEA in certain circumstances, with the CFTC having the discretion to intervene).[10]

Importantly, this savings provision emphasizes the extent to which the CFTC's "exclusive jurisdiction" would "supersede or limit the jurisdiction" of other "regulatory authorities"—it does not discuss the extent to which state laws would or would not be preempted or superseded. It manifests Congress's intent to preserve the authority of other regulatory authorities to the extent those authorities do not mirror or supplant the CFTC's regulatory functions.

It's true that Section 2(a)(1)(A) conveys jurisdiction over swaps "traded or executed *on a [DCM] pursuant to section 7*" of the CEA. The

---

[10] Confusingly, Polymarket also argues that § 13a-2(1)-(3) preserves the CFTC's exclusive jurisdiction over those DCMs because it doesn't allow the state to enforce all of the CEA's provisions against a DCM. Appellant's Br. 32. Polymarket admits the section allows the state to enforce the CEA against non-DCM actors, like traders for market manipulation violations. *Id.* at 54. Polymarket also admits that states can enforce CEA antifraud provisions against DCMs as well. *Id.* This implies that the CFTC's exclusive jurisdiction only applies to DCMs, meaning the States can enforce gambling laws against anyone trading on a DCM.

Contrary to Polymarket's argument (Appellant's Br. 54-56), § 13a-2(1) does not help it either. That section excludes States from enforcing the CEA against contract markets. But Michigan wants to enforce its own laws, not the CEA, so the provision is inapplicable.

CEA then confines the CFTC's authority over DCMs to "mak[ing] and promulgat[ing] such rules and regulations as . . . are reasonably necessary to effectuate any of the provisions of [the CEA] or to acc*omplish any of the purposes of [the CEA]*." 7 U.S.C. § 12a(5) (emphasis added). The CEA's codified findings and purposes in Section 5 then significantly limits the CFTC's "exclusive jurisdiction."

Each of these purposes is focused on establishing a self-regulated system wherein commodity derivatives can be traded in a "financially secure" environment free of traditional market dangers, such as price manipulation or fraud. *See* 7 U.S.C. § 5.[11] Consistent with these purposes, and Dodd-Frank as a whole, the other provisions in the CEA are limited to creating financially secure markets free of traditional market dangers. For example, although Congress included provisions related to "excessive speculation," 7 U.S.C. § 6a; "contracts designed to defraud or mislead," 7 U.S.C. § 6b; insider trading, price manipulation,

[11] In addition, it provides that "transactions subject to this chapter are entered into regularly in *interstate* and *international* commerce . . . ." 7 U.S.C. § 5. Sports betting would not have been entered into regularly in interstate and international commerce, as it was illegal under the Wire Act every time the CEA was amended, with the exception of horseracing, which was already governed by the IHA.

and other conduct that traditionally threatens the stability of markets, 7 U.S.C. § 13; Congress did not attempt to establish the legality of the underlying subject matter of the transactions occurring on those markets. *See generally* 7 U.S.C. § 1 *et seq*.

Instead, Congress manifested throughout an intent to defer to other regulatory authorities regarding the underlying legality of specific transactions. Section 12a contemplates that the CFTC would refuse to register or to revoke the registration of various market actors where those actors have been convicted of various State crimes, including embezzlement, theft, fraud, forgery, counterfeiting, false pretenses, bribery, and *gambling*. 7 U.S.C. § 12a(2). Although fraud is a core concern of the CEA (*with express provisions addressing and prohibiting fraud*), Section 13a-2(7) expressly provides that States are not prohibited "from proceeding in a State court against any person registered under [the CEA] . . . for an alleged violation of any general civil or criminal antifraud statute of such State."[12]

[12] Polymarket argues (Appellant's Br. 56) that the inclusion of antifraud laws excludes other laws, but Congress clarified that States were not preempted from enforcing "antifraud" laws because the CEA contains multiple provisions addressing fraud. The CEA does not contain

Finally, Section 7a-2 authorizes the CFTC to prohibit transactions on any DCM if the transactions involve certain specified activities, including an "activity that is unlawful under any Federal or State law." *See Martin*, 793 F. Supp. 3d at 680 ("That plain text clearly reflects an affirmative intent to preserve state laws governing whether particular conduct is lawful or unlawful.").

#### a. The CEA contains other provisions that *do* expressly preempt state law.

Those provisions confirm that Congress knew how to enact express-preemption provisions in the CEA, and that it did *not* do so with respect to state gaming law generally. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995).

Two provisions state that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" with respect to only specific products, not swaps. 7 U.S.C. § 16(e)(2); § 27f. Those provisions would be superfluous if the exclusive-jurisdiction provision already preempted state gaming law. *See Schuler*

provisions addressing gambling, except the express-preemption provisions that do not help Polymarket.

*I*, 2026 WL 657004 at *8 (quoting *Martin*, 793 F. Supp. 3d at 681). It shows that Congress specified exactly what it wanted to preempt when it comes to gaming—and it was *not* all gaming law.

Polymarket may argue that Section 27f(b), which preempts state "gaming" laws as to "hybrid instruments," applied only to products that were excluded from the CFTC's exclusive jurisdiction provision in 2000. 7 U.S.C. § 27a(a). But Congress significantly altered § 27-27f in Dodd-Frank, repealing some sections and modifying others. It kept both the provision that preempts state "gaming" laws expressly (§ 27f(b)) and sections that contemplate that some hybrid instruments may be swaps or futures subject to the CFTC's "exclusive jurisdiction" provision. *See* 7 U.S.C.§ 27c; 27d (discussing a "predominance test" to determine whether a hybrid instrument should be considered a "banking product" or a swap or future subject to CFTC jurisdiction); 7 U.S.C. § 27a(c) (creating an exception to the exclusion from the CFTC's jurisdiction for products that meet certain conditions and one of those conditions is that the product is "known to the trade as a swap" or "otherwise has been structured . . . for the purpose of evading the [CEA]"). Clearly,

Congress considered that some of those "hybrid instruments" may also be subject to the "exclusive jurisdiction" provision of the CEA.

The other express-preemption provision preempts state insurance law: It says that a swap "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h)(2). Polymarket essentially wants the Court to read into the CEA an equivalent provision for gaming, but the CEA conspicuously does not contain one.

Counterintuitively, Polymarket implies (Appellant's Br. 30) that the federal scheme's use of narrow express-preemption clauses favors broad preemption. Polymarket's idea is that, because one of the express-preemption clauses addresses off-market transactions, state regulation of on-market transactions must already be preempted. But that rough logic does not explain the express-preemption provision about insurance. *See* § 16(h). That provision preempts state insurance law as to "swap[s]" regardless of their on- or off-market status. *Id.*

#### b. Dodd-Frank added an express preemption provision *only* for specific security-based swaps.

Dodd-Frank amended several statutes in response to the financial crisis, and within the same Title VII of the Dodd-Frank Act, it amended

both the CEA and the SEA. Though Dodd-Frank expressly amends the SEA to preempt state regulation of certain security-based swaps, it did nothing comparable about swaps in the CEA. *See* Dodd-Frank § 767 (amending 15 U.S.C. § 78bb(a)). This provision explicitly calls out what state laws are preempted and the extent of that preemption. *Id.* (preempting "state law which prohibits or regulates the making or promoting of wagering or gaming contracts" as to specified security-based instruments).

Polymarket asks (Appellant's Br. 30) this Court to assume that in the same Dodd-Frank Act that made these changes, Congress chose to use completely different language to "expressly" preempt state law without specifying which state laws were preempted. *Contra Pulsifer v. United States*, 601 U.S. 124, 151 (2024) (noting that "Congress drafted" the provisions "at different times" in explaining diffences in language used). That's wrong.

**c. None of the authorities Polymarket cites say that "exclusive jurisdiction" means preemption.**

Polymarket cherrypicks different dictionary definitions that do nothing to explain why Congress would not clarify what state law is

preempted and the extent of that preemption. The decisions that Polymarket cites (Appellant's Br. 25) where "exclusive jurisdiction" supposedly means preemption do not help either. None of those decisions involved a federal statute that conferred "exclusive jurisdiction" on a federal agency. Nearly all involve the Federal Power Act or Natural Gas Act, neither of which contain "exclusive jurisdiction" language.

Statutes that *do* use "exclusive jurisdiction" to confer authority on a federal agency confirm that the term is not one of express preemption. For example, 30 U.S.C. § 1254(a), provides that the Secretary of the Interior has "exclusive jurisdiction" over surface coal mining when adopting a federal plan for a State, then § 1254(g) separately provides that the federal plan "shall preempt[] and supersede[]" state regulations and clarifies that preemption is limited "insofar as they interfere with" accomplishing the goals of the statute and indicates that the Secretary must clearly "set forth any State law or regulation" that is preempted.

Polymarket also cites *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-236 (1947). But in *Rice*, the Court emphasized the unique legislative history of the statute in question, which involved a repeal of

express language making federal law subordinate to the states and unequivocal indication in a senate report that the intention of the new language was to occupy the field of regulation. *See id.* at 232-34. Notably, the statute also did not include any savings clause. The same is not true for Dodd-Frank and Polymarket's citation to legislative history from 50 years prior is not persuasive.

**d. The savings clauses do not help Polymarket.**

Polymarket cites (Appellant's Br. 28) Section 2(a)(1)(A)'s savings clause, which provides that "[e]xcept as hereinabove provided" (in the "exclusive jurisdiction" provision), "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on "regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A). Polymarket claims this shows preemptive effect, but the clause equally suggests the opposite. "A savings clause generally 'negates the inference that Congress left no room for state causes of action.' " *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). Even if the savings clause suggests some preemption, it does not support the view that § 2(a)(1)(A) expressly preempts state

*gaming* law as opposed to prohibiting duplicative regulatory schemes over commodities trading

Polymarket offers no explanation of what the second savings clause (about state-court jurisdiction) actually preserves if state law is completely preempted. As for the first savings clause (about state regulatory authority), Polymarket stresses (*e.g.* Appellant's Br. 28) that the clause signals some level of preemption. But Polymarket never explains which state "regulatory authorit[y]," § 2(a)(1)(A), the clause preserves given that § 2(e) forces all swaps onto DCMs.

Additionally, Polymarket neglects to acknowledge that the exclusive jurisdiction language is immediately followed by the limitation "except to the extent otherwise provided in [Dodd-Frank]". 7 U.S.C. § 2(a)(1)(A). Both the statute's Special Rule and the CFTC's enacting regulation 40.11 provide an express carve-out from the CFTC's regulation of event contracts if those contracts relate to "gaming" or activities that are "unlawful under any State . . . law." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I); 17 C.F.R. § 40.11(a).

This expressed deference to state law, adopted pursuant to one of the exceptions to CFTC jurisdiction which 7 U.S.C. § 2(a)(1)(A)

provides, directly evidences Congress' intent to "avoid[] unintended encroachment on the authority of the States" as it pertains to event contracts. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993); *see also, e.g.*, *Schuler I*, 2026 WL 657004 at *8 (noting that the express reference to the "laws . . . of any State" in 7 U.S.C. § 2(a)(1)(A) "leaves ample room for states to legislate and regulate . . . on matters tangential to trading swaps and commodity futures on DCMs").

#### e. The fact that Polymarket must resort to statutory *history* to make an *express* preemption argument is telling.

Polymarket claims (Appellant's Br. 26-27, 30, 66-67) that the statutory *history* of the CEA supports its *express* preemption argument. To reach this conclusion, Polymarket reaches back to an amendment from 1974 that deleted a savings clause for state law. Polymarket forgets that "swaps" were not regulated by the CEA until Dodd-Frank added them in 2010, and added back in the savings clause discussed above. *Compare* Pub. L. No. 93-463 § 201(b), 88 Stat. 1389, 1395 (1974), *with* 7 U.S.C. § 2(a)(1)(A).

### 2. Field preemption does not apply.

Polymarket asserts (Appellant's Br. 52) that Congress impliedly occupied the field of "regulating trading on a DCM." "The presumption against preemption operates with special force in cases in which Congress has legislated in a field which the States have traditionally occupied." *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (cleaned up). "States, of course, have traditionally regulated intrastate gambling activity like [sports betting]." *Churchill Downs,* 162 F.4th at 635.[13] Crucially, it "accounts for the historic presence of state law" but "the existence of federal regulations does not undermine the presumption against preemption." *Fenner*, 113 F.4th at 594. The Court should reject this broad field-preemption argument for two reasons: (1) Polymarket's proposed preemption field—a field that must be construed narrowly—produces indefensibly broad preemption; and

[13] Polymarket also cites *dicta*, from a *footnote*, where the Court suggested without explanation that "interstate gambling isn't a traditional area of state regulation." *Id.* at 641 n.5. Not true. *See* Jenny Tang, *The Multi-State Internet Gaming Agreement (MSIGA),* Poker Industry News (May 4, 2025), https://tinyurl.com/y37rmnw6 (MSIGA started in 2014). The lack of interstate sports betting is because nearly all States outlawed it. *See Murphy*, 584 U.S. at 458. To the extent some States have allowed sports betting, *they have* regulated betting on games in other States.

(2) the generally applicable State laws at issue do not target Polymarket's proposed field.

Regarding field preemption, *Churchill Downs* explained "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." 162 F.4th at 638. The Michigan provision at issue was a "tailor-made addition to the IHA." *Id*. at 639. In contrast, Michigan has regulated sports betting and gambling for years before Polymarket's new interpretation of Dodd-Frank. *See* 2019 P.A. 149. Michigan's laws also do not target *interstate* betting, they only focus on *intrastate* betting.

Commodity-futures regulation and gaming regulation are different fields with different regulatory needs and policy goals. *See* 89 Fed. Reg. at 48982-83. Commodity-futures markets serve an important function in our Nation's economy—they allow commercial sellers and buyers of commodities to manage financial risk by trading with investors. *See* 7 U.S.C. § 5(a). Although some previously characterized commodity-futures trading as akin to gambling, this trading is permitted so that commodity-futures markets may efficiently function. *See Merrill Lynch*, 456 U.S. at 358-59. The CFTC regulates

trading to curb excess speculation and ensure that prices reflect economic reality. *See* 7 U.S.C. § 6(a).

In contrast, sports betting is a form of entertainment. The millions of people who gamble on sports do not seek to hedge existing financial risks; they create the risk by betting. Gaming is regulated as a form of entertainment to ensure that it is fair and free of criminal elements, and to protect the public (especially young people and problem gamers). *Greater New Orleans*, 527 U.S. at 185. The CEA simply does not contemplate that type of regulation.

As discussed above, there is no clear statement that Congress intended to preempt state *gaming* law. *Martin*, 793 F. Supp. 3d at 680. The CEA does not expressly refer to gaming, except in limited circumstances that do not help Polymarket. *See* 7 U.S.C. §§ 7a-2(c)(5), 16(e)(2), 27f. The CEA also does not contain a comprehensive regulatory scheme for gaming and lacks the most basic features of such a scheme. *Supra* at 8.

Polymarket argues (Appellant's Br. 53-54) that the CEA contains a comprehensive scheme for regulating commodity-futures trading that field preempts state gaming law. However, those decisions suggest only

that the CEA has *some* preemptive effect. Also, the decisions address *bona fide* commodity derivatives; none addresses sports wagers *recast* as commodity derivatives. The decisions that "carefully focused on the scope of Congress's preemptive intent" recognized "that intent had limits." *Martin*, 793 F. Supp. 3d at 682; *see, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (the CEA preempts only state laws that "directly affect trading on or the operation of a futures market"—which Michigan's licensing requirements do not). These materials do not show that Congress intended to preempt the field of sports betting. *Martin*, 793 F. Supp. 3d at 684 n.5.

Instead, case law demonstrates a much narrower federal focus where fields of preemption could preclude States from creating supplemental rules for admission to markets regulated by the CFTC; or imposing additional reporting or compliance requirements related to activities regulated under the CEA. *See, e.g., Witzel v. Chartered Sys. Corp. of New York*, 490 F. Supp. 343, 347-48 (D. Minn. 1980) (CEA would preempt State laws only where laws "envision . . . administrative

agency involvement which might conflict with the CFTC's regulatory role").

One of the cases Polymarket cited rejected, as "specious," a similar argument that "whatever the [CFTC] may regulate, it regulates exclusively." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001). The D.C. Circuit explained the argument ignores the "imperfect overlap between" the CFTC's exclusive jurisdiction and its other authority. *Id.*

Polymarket also cites (Appellant's Br. 54) *Arizona v. United States*, 567 U.S. 387 (2012), but that case does not help Polymarket. Despite "extensive and complex" federal regulation of immigration, the Supreme Court did not conclude that all Arizona immigration laws were preempted. 567 U.S. 387 (2012). Instead, the Court considered the four State immigration laws at issue separately, concluding that one was field-preempted, two were conflict-preempted, and the fourth law was *not* preempted because Congress left "room" for State regulation on that specific State immigration law. *Id.* at 400-15.

Additionally, *Arizona* is completely different because the state law in that case targeted violations of federal immigration law. *Id.* at 403,

406. In contrast, Michigan's laws target sports betting, not commodity derivatives trading. *See* Mich. Comp. Laws § 432.402.

Polymarket's field-preemption claim should be rejected because the proposed field is impermissibly broad and challenges generally applicable laws that are not properly excluded under a field-preemption theory.

### 3. Michigan's sports betting laws do not conflict with the federal law.

"A state law is 'conflict' preempted only *to the extent it actually conflicts* with federal law, that is, when it is *impossible* to comply with both state and federal law, or where the state law stands as an *obstacle* to the accomplishment of the full purposes and objectives of Congress." *Fenner*, 113 F.4th at 594 (cleaned up, emphasis added). Neither form applies here.

#### a. Enforcing Michigan gaming law is not an obstacle to Dodd-Frank's objectives.

Obstacle preemption too must stem from the text; it is not a freewheeling inquiry by which courts guess at Congress's objectives. *Kansas*, 589 U.S. at 202. No statute, moreover, pursues its purpose at

all costs. *Henson*, 582 U.S. at 89. There is a "high threshold" to prove that "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" such that obstacle preemption applies. *Fenner*, 113 F.4th at 594. There is no evidence of a congressional purpose to allow sports gambling on DCMs. *Above* at 43-46, 50-51. And even if Congress intended to allow sports betting on DCMs, Polymarket could obtain a Michigan license (as FanDuel and DraftKings have) and offer its wagers. *See* Mich. Comp. Laws § 432.404(7).

Polymarket makes two arguments: first, that preempting state law is necessary to achieve uniformity of regulation in contract markets, and second, that state law would deprive it of "a valuable benefit granted" to it in the form of self-certification.

**Self-Certification**

While self-certification may be an incidental benefit for DCMs, arguably its purpose is to offload the burden of ensuring contracts are compliant with applicable federal and state law from the CFTC to the DCM. As with many highly regulated industries, there is a "resource gap between the agency and the entities [it] regulate[s]." Mary Shapiro,

SEC Chairman, *Statement Concerning Agency Self-Funding* (April 15, 2010), https://www.sec.gov/news/speech/2010/spch041510mls.htm. Self-certification puts the onus on the DCM to ensure compliance, similar to filing taxes.

The district court correctly identified that "Plaintiff cites no authority establishing a 'right' to trade post-self-certification *without any potential restriction or consequence*." Op., R. 41, PageID#1127 (emphasis added). Polymarket can still self-certify and list whatever it wants.

The alleged "valuable benefit" would be getting to list it; a lack of consequences is not included in that benefit. *See Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 564 (6th Cir. 1998). Polymarket could list for trading an assassination contract that pays out after someone murders their spouse or a security (subject to the jurisdiction of the SEC, not the CFTC) and self-certify that they were swaps. Self-certification alone does not save Polymarket from any applicable state criminal laws. Polymarket would still have consequences for any applicable state criminal laws and its violation of the SEA, which prohibits exchanges not registered with the SEC from listing securities.

**Uniformity**

Polymarket's uniformity argument repackages its unavailing field preemption arguments. *See Fednav, Ltd. v. Chester*, 505 F. Supp. 2d 381, 397 (E.D. Mich. 2007), aff'd, 547 F.3d 607 (6th Cir. 2008). Notably, uniformity was not included by Congress as a purpose of the CEA. *See* 7 U.S.C. § 5. To the extent this argument offers anything new, it is to invoke "generic uniformity concerns." *See Schuler II*, 2026 WL 1295806, at *6. Those concerns are not enough "to meet the high threshold required to establish obstacle preemption." *Id.* (quotation omitted). Conflict preemption assumes that states may regulate and may regulate nonuniformly. *See Wyeth*, 555 U.S. at 575.

Additionally, this uniformity argument fails because Congress also made it illegal under federal law to operate a business within a state in a manner that violates state gambling laws. *See* 18 U.S.C. § 1955. The CEA was enacted under a federal framework that recognizes that gambling laws would differ between states.

### b. It is not impossible for Polymarket to comply with Michigan law and the CEA.

Polymarket asserts that complying with Michigan gaming law would violate a CFTC "core principle" that requires DCMs to provide "impartial access" to their markets. 17 C.F.R. § 38.151(b). Not so.

The impartial-access requirement prevents DCMs from discriminating based on wealth or exclusivity. *See* Core Principles and Other Requirements for DCMs, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010); *see also Martin*, 793 F. Supp. 3d at 686. It does not require DCMs to offer identical products in every State. Competitors similarly have launched or are planning to launch location-restricted prediction markets.[14]

Polymarket's example (Appellant's Br. 66) that it is *allowed* to let 18-year-olds buy sports "event contracts" under the CEA, and Michigan bans gaming under age 21 does not show a conflict. *See* Mich. Comp. Laws § 432.411(1). State law can be more protective than federal law.

---

[14] *See* Dan Bernstein & Eben Novy-Williams, *Fanatics Launches a Prediction Market—Without the G-Word*, Sportico (Dec. 3, 2025), perma.cc/6YQW-QS9R; Sean Treppedi, *FanDuel Launching Prediction Markets App to Target Non-Sports Betting States*, N.Y. Post (Nov. 13, 2025), perma.cc/T9MM-F7RG.

*See Wyeth*, 555 U.S. at 573 (allowing states to require stronger warning labels than the FDA). Thus, Polymarket failed to show that it is impossible to comply with both Michigan gaming law and the CEA.

Finally, even if this Court were to find that Michigan's geographic requirements conflicted with some of the CEA's requirements, the solution is to enjoin *only those requirements that actually conflict*, not Michigan's *entire* statutory scheme. *See Fenner*, 113 F.4th at 594.

## II. The district court did not abuse its discretion in finding that the balance of harms favors Michigan.

The balance of harms favors Michigan. Op., R. 41, PageID#1129. The district court correctly held that "core concerns in the state's purview" including "threats to people under 21 from the availability of gambling opportunities, threats of addictive or compulsive behaviors, [and] threats to finances of its local governments" are implicated. *Id*. Polymarket's "potential losses to its business interests, even if irreparable, pale in comparison to the potential losses to the public." *Id.* And it is always in the public interest to "give effect to the will of the people" of the State. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020).

## CONCLUSION

This Court should affirm.

Respectfully submitted,

/s Lauren E. Fitzsimons
Lauren E. Fitzsimons
Felepe H. Hall
Jason A. Geissler
Assistant Attorneys General
Attorneys for Defendants - Appellees
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
FitzsimonsL@michigan.gov
HallF2@michigan.gov
GeisslerJ@michigan.gov

Dated: September 16, 2026

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words. This document contains 13,000 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

/s/ Lauren E. Fitzsimons
Lauren E. Fitzsimons
Felepe H. Hall
Jason A. Geissler
Assistant Attorneys General
Attorneys for Defendants - Appellees
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
FitzsimonsL@michigan.gov
HallF2@michigan.gov
GeisslerJ@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on September 16, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

s/ Lauren E. Fitzsimons
Lauren E. Fitzsimons
Felepe H. Hall
Jason A. Geissler
Assistant Attorneys General
Attorneys for Defendants - Appellees
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
FitzsimonsL@michigan.gov
HallF2@michigan.gov
GeisslerJ@michigan.gov

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees, per Sixth Circuit Rule 28(a), 28(a)(1)-(2), 30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Compl. | 03/04/2026 | R. 1 | 1-26 |
| P.I. Mot. | 03/06/2026 | R. 13 & 14 | 50-89 |
| T.R.O. Op. | 03/10/2026 | R. 17 | 231, 235 |
| Op. | 06/16/2026 | R. 41 | 1100-1130 |